John T. HILL, et al., Plaintiffs,

v.

The EQUITABLE TRUST COMPANY, et al., Defendants.

Civ. A. No. 82–220.

United States District Court,
D. Delaware.

May 3, 1983.

Harvey S. Kronfeld of Rawle & Henderson, Philadelphia, Pa., for plaintiffs.

Martin I. Lubaroff of Richards, Layton & Finger, Wilmington, Del., for defendant, The Equitable Trust Co.; Michael D. Colglazier and Edward F. Shea, III of Miles & Stockbridge, Baltimore, Md., of counsel.

Martin I. Lubaroff of Richards, Layton & Finger, Wilmington, Del., for defendant, Mercantile-Safe Deposit & Trust Co.; Nell B. Strachan and Cynthia Meyers Hahn, Baltimore, Md., of counsel.

---

**OPINION**

CALEB M. WRIGHT, Senior District Judge.

This action, involving eight plaintiffs and two defendant banks, concerns various alleged violations of the Securities Act of 1933 (hereinafter "1933 Act"), the Securities Exchange Act of 1934 (hereinafter "1934 Act"), and regulations of the Securities and Exchange Commission promulgated thereunder. In addition, the plaintiffs further allege various state law claims pursuant to the laws of Delaware and Maryland. Although the Complaint purports to set forth only eight counts, the two counts based on the securities laws allege violations of numerous sections of the 1933 and 1934 Acts. Jurisdiction is predicated on Section 22(a) of the 1933 Act, 15 U.S.C. § 77v(a), Section 27 of the 1934 Act, 15 U.S.C. § 78aa, and pendent jurisdiction.

The case is currently before the Court on the defendant's, Equitable Bank, N.A.[1] (hereinafter "Equitable"), Motion to Dismiss and/or Quash Return of Service, and the defendant's, Mercantile-Safe Deposit & Trust Company (hereinafter "Mercantile"), Renewed Motion to Dismiss, pursuant to Fed.R.Civ.P. 12(b). Equitable has moved for dismissal on the following grounds: (1) personal jurisdiction in Delaware is lacking: (2) venue is improper under the securities laws and 12 U.S.C. § 94 (venue pertaining to national banks); (3) the plaintiffs' securities law claims are barred under the applicable statute of limitations; (4) the plaintiffs have failed to set forth securities law claims upon which relief can be granted; (5) the Court lacks subject matter jurisdiction over the pendent state law claims because there are no cognizable federal claims; and (6) the punitive damages sought by the plaintiffs, as a matter of law, are not recoverable under the federal securities laws. The defendant Mercantile asserts the same grounds for dismissal except that it does not contest the propriety of

---

1. Equitable Bank, N.A. is the successor in interest to the named defendant, The Equitable Trust Company. Subsequent to the date this action was filed, The Equitable Trust Company became a national banking association.

jurisdiction and venue in this district.[2] In connection with the portion of the defendants' motion that seeks dismissal for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6), the parties have filed affidavits and other extrinsic materials. Consequently, except to those issues which pertain to jurisdiction and venue, the defendants' motions must be treated as motions for summary judgment made pursuant to Fed.R.Civ.P. 56.[3] Fed.R. Civ.P. 12(b); *see Moreland v. Western Pennsylvania Interscholastic Athletic League,* 572 F.2d 121, 126–27 (3d Cir.1978).

The Court is initially confronted with interpreting the lengthy yet rather nebulous Complaint filed in this case. In addition, the plaintiffs in their briefs and at oral argument have alleged various facts which do not appear in the current record. Nevertheless, because a presentation of the facts is essential to any discussion of the legal problems in this case, the Court has attempted to distill and set forth the operative facts as thus far developed in the record. The facts and legal analysis are first presented as they pertain to the Wilmington House Associates (hereinafter "Wil-

mington House") transaction and then as they relate to the Eagle Associates (hereinafter "Eagle") venture.[4]

## WILMINGTON HOUSE

### 1. *Factual Background*

Wilmington House was a limited partnership organized and existing under the laws of the State of Maryland. Wilmington House was formed solely for the purpose of acquiring Lancaster Court, another limited partnership, which owned and operated a 324 unit garden apartment complex in Wilmington, Delaware. The general partners of Wilmington House were Lee P. Der, Inc., a Maryland corporation, and David E. Karr, a Maryland attorney. The sole shareholder of Lee P. Der, Inc., was Lee P Der (hereinafter "Der"), a natural person residing in Baltimore County, Maryland.

In early October, 1977, Der[5] offered to sell to the plaintiffs John T. Hill, Descomp, Inc., Virgil Scott, Marie Scott, Thomas Ruger, and Patricia Ruger (collectively "Wilmington House plaintiffs"), limited partnership interests in Wilmington House. As a

---

**2.** Mercantile initially contested the propriety of jurisdiction and venue in Delaware and briefed those issues. Subsequently, in a letter to the Court dated February 14, 1983, Mercantile waived these defenses. *See Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 102 S.Ct. 2099, 2105, 72 L.Ed.2d 492 (1982) (waiver of jurisdictional issues proper).

**3.** The Court did not inform the parties that this motion would be treated as one for summary judgment, although all parties submitted affidavits and were aware of the requirements of Rule 12(b). Nevertheless, in this Circuit, it is required that the parties be notified that a motion to dismiss will be treated as one for summary judgment, primarily to afford the party opposing the motion time to prepare adequately. *See Crown Central Petroleum Corp. v. Waldman,* 634 F.2d 127, 129 and n. 7 (3d Cir. 1980). However, because the Court does not at this time enter final judgment on any issue to which any affidavit pertains, or could possibly pertain, *compare Bryson v. Brand Insulations, Inc.,* 621 F.2d 556, 559 (3d Cir.1980), the Court has proceeded to dispose of certain issues solely on the pleadings. In sum, those claims that

will be dismissed involve issues that have been resolved without affidavits, and thus the procedure remains within the scope of a motion to dismiss. Consequently, notice to the parties is not required.

**4.** Those portions of the facts that do not pertain to the jurisdiction and venue issues are presented so that all of the plaintiffs' allegations and affidavits are taken as true. *Mortensen v. First Federal Sav. and Loan Ass'n.,* 549 F.2d 884, 891 (3d Cir.1977). In addition, all inferences that are favorable to the plaintiffs have been drawn from the record. *Id.*

**5.** Actually several people allegedly offered to sell the partnership interests to these plaintiffs. These people have been sued by the plaintiffs in a related action, *Hill v. Der, et al.,* 521 F.Supp. 1370 (D.Del.1981). The plaintiffs specifically mention D & S Financial, Inc., a Maryland broker-dealer corporation controlled by Der, as the offeror. For convenience, however, the Court will refer to Der as being the representative of all these people, even though others may have acted similarly.

result of Der's solicitations, Descomp, Inc., Virgil and Marie Scott, and Thomas and Patricia Ruger purchased Wilmington House limited partnership shares in November, 1977. Similarly, John T. Hill purchased a share in December, 1977. The limited partnership agreement required each plaintiff to make a cash down payment towards the purchase price. The agreement further provided that additional installment payments were to be made.[6] Each of these installment payments was to be secured by irrevocable letters of credit drawn for the benefit of Wilmington House.

Der suggested to the Wilmington House plaintiffs that they apply to the defendant Equitable for the required letters of credit. The Wilmington House plaintiffs did apply to Equitable and subsequently they received the desired letters of credit. On information and belief, the plaintiffs allege that certain officers of Equitable, most notably Stephen Meszaros, approved the plaintiffs' letter of credit application because Der bribed them to do so. When Equitable allegedly discovered the perfidy of its employees, it discharged them. Equitable, however, never informed the plaintiffs of the bribes, nor of the subsequent discharge of the bribed employees.

The Amended Complaint filed in *Hill v. Der,* 521 F.Supp. 1370, indicates that the Wilmington House venture encountered difficulties as early as December, 1977. The plaintiffs first learned of the acuity of these problems in early February, 1979, but Der allayed the plaintiffs' fears. In April, 1979, however, the plaintiffs received further information that led them to realize the severity of the financial problems of Wilmington House. Nevertheless, the plaintiffs continued to make the required installment payments, up to and including that of February 1, 1980.

Subsequently, the venture apparently failed completely and the Wilmington

House plaintiffs sued Der and his alleged associates. In connection with that suit, John T. Hill wrote to Equitable on March 9, 1981, generally inquiring into the issuance of the letters of credit and specifically asking whether any Equitable employees were discharged as a result of the issuance of said letters. In an April 27, 1981 reply letter, Equitable Vice President and Counsel Martin B. Ellis informed Hill that there were no irregularities concerning the issuance of the letters of credit, and further that no employees were dismissed or asked to resign because of this matter.

On March 17, 1981, Virgil Scott wrote a letter to Equitable on behalf of Descomp, Inc., making further inquiries into the issuance of the letters of credit. In a letter of April 27, 1981, Martin B. Ellis similarly informed Mr. Scott that there were no irregularities or employee discharges in connection with the issuance of the letters of credit.

On March 20, 1982, Thomas Ruger received a telephone call from Martin E. Mason, a defendant in *Hill v. Der, et al.,* 521 F.Supp. 1370, in which Mason allegedly informed Ruger that Der had provided kickbacks to employees of Equitable in connection with Wilmington House. Shortly thereafter Ruger, along with Virgil Scott, met with Mason who allegedly informed them of some of the specifics of the kickback scheme. Subsequently, this action was filed against Equitable on April 30, 1982.

### 2. *Jurisdiction and Venue*

#### A. *Jurisdiction*

■ A threshold issue is whether Equitable is amenable to suit in Delaware. Fed.R. Civ.P. 4(e) permits service of process upon a party not an inhabitant of or found within the state by any method permitted by state statute or court rule. Consequently, in this federal question case, the propriety of ser-

---

**6.** The payments were to be made on May 1, 1978, February 1, 1979, February 1, 1980, and

February 1, 1981.

vice and the exercise of jurisdiction is measured under 10 *Del.C.* § 3104(c)(4). Section 3104(c)(4) provides:

> (c) As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or his personal representative, who in person or through an agent:

> (4) Causes tortious injury in the State or outside of the State by an act or omission outside of the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State, or derives substantial revenue from services, or things used or consumed in the State. . . .

Equitable does not contest that the plaintiffs' statutory claims constitute allegations of tortious injury as that term is used in Section 3104(c)(4). *See Magid v. Marcal Paper Mills, Inc.,* 517 F.Supp. 1125, 1130 (D.Del.1981) (and cases cited therein). Consequently, Equitable is amenable to suit in this case if it either (1) conducts a substantial volume of business in Delaware; *or* (2) persistently engages in conduct in Delaware. *Id.*[7] It is beyond peradventure that Equitable's activities in Delaware satisfy both these requirements, and therefore the exercise of jurisdiction is proper.

There are many factors which indicate that Equitable has a substantial jurisdictional presence in Delaware. First, an Equitable affiliate that handles Equitable's credit card operations, Equitable Bank of Delaware, is located in Delaware. Equitable Bank of Delaware services the credit card customers of Equitable.[8] Under Section 3104(c)(4), if Equitable Bank of Delaware is an agent of Equitable in Delaware, then Equitable is amenable to suit in Delaware. *See Jayne v. Royal Jordanian Airlines Corp.,* 502 F.Supp. 848, 856–57 (S.D.N.Y.1980) (applying New York law).

The record is not adequately developed for this Court to hold that Equitable is amenable to suit in Delaware simply because Equitable Bank of Delaware is its agent in this State. *See LaChemise Lacoste v. General Mills, Inc.,* 53 F.R.D. 596, 603 (D.Del.1971) (proof of agency must be clear before subsidiary's acts attributable to parent), *aff'd,* 487 F.2d 312 (3d Cir.1973). It may well be if the Court ordered additional jurisdictional discovery, an agency relationship could be established. In light of Equitable's other substantial contacts with Delaware, however, it is unnecessary to predicate jurisdiction solely on the acts of Equitable Bank of Delaware. It is sufficient to state that the activities of Equitable Bank of Delaware constitute a significant major contact of Equitable in Delaware. *See Perry v. American Motors Corp.,* 353 A.2d 589, 592–93 (Del.Super.1976).

Equitable also maintains banking relationships with several Delaware banks. From at least 1978–1982, the Wilmington Trust Company and the Delaware Trust Company have performed check clearing and wire transfer services on a continuing basis for Equitable. Equitable also has

---

**7.** 8 *Del.C.* § 382 is another means by which this Court could acquire jurisdiction in this case. The requirements of 8 *Del.C.* § 382 are stricter, however, than those of 10 *Del.C.* § 3104(c)(4). Section 382 not only requires that the defendant transact business generally in Delaware, it also requires that the civil action in question arise or grow out of the business conducted in this state. *See Simpson v. Thiele, Inc.,* 344 F.Supp. 7, 8 (D.Del.1972). 10 *Del.C.* § 3104 (c)(4) does not have this second requirement and is therefore an expansion beyond § 382. *Magid v. Marcal Paper Mills, Inc.,* 517 F.Supp. at 1129. Consequently, if suit is not proper under Section 3104(c)(4), it is similarly improper under Section 382.

**8.** The exact nature of the relationship between Equitable and Equitable Bank of Delaware has not been established, although Equitable has not challenged plaintiffs' assertion that the Delaware affiliate services Equitable's credit card customers. In addition, the Court takes judicial notice that many major out-of-state banks service their credit card customers through Delaware affiliates or subsidiaries in order to benefit from this State's liberal laws regarding credit card finance charges.

maintained bank accounts with these two banks continuously from at least 1978–1982. In addition, Equitable maintained a $700,000 certificate of deposit with the Wilmington Savings Fund Society from 1978–1980 as part of a mutual relationship between Equitable and that bank pertaining to reserve requirements.

Furthermore, Equitable has engaged in various commercial loan participations in Delaware during the relevant time period. For example, Equitable currently participates in three mortgage participations with the Sussex Trust Company, a Delaware bank. The aggregate amounts of the mortgages is near $500,000 and they provide Equitable with income of about $50,000. In addition, because of their proximity to Delaware, Equitable branch offices have likely made loans to Delaware residents. It is certain that Equitable has had interests in property located in Delaware. *See Equitable Trust Co. v. O'Neill,* 420 A.2d 1196, 1198 (Del.Super.1980). Equitable also has engaged in litigation in this State concerning its Delaware financial affairs, and has benefited from the Delaware court system. *Id.* In sum, Equitable has involved itself in regular business and legal relations within Delaware.

Equitable's only apparent argument that these substantial and persistent contacts with Delaware are insufficient to sustain jurisdiction is that these contacts do not constitute a substantial part of Equitable's business.[9] The mere fact that Equitable's Delaware contacts may provide it with only a small portion of its total income, however, is not decisive. Generally speaking, the appropriate inquiry under Section 3104(c)(4) is whether Equitable, in absolute dollar amounts, "derives substantial revenue" from Delaware. *See, e.g., Plumb v. Cottle,* 492 F.Supp. 1330, 1334 (D.Del.1980), ($34,000 and $21,000 in income in 1978 and 1979 respectively, which constitute 3% and 2% of yearly income respectively, is substantial revenue for purposes of Section 3104(c)(4)). Consequently, even if the Court considered only Equitable's income derived from the mortgage participations ($50,000), such income likely would be sufficiently substantial to satisfy the requirements of Section 3104(c)(4). As already has been discussed, however, Equitable engages in many other ventures in Delaware beyond the mortgage participations. Therefore, it is clear that Equitable "derives substantial revenue" from Delaware that makes it amenable to suit in Delaware pursuant to 10 *Del.C.* § 3104(c)(4).

Furthermore, even if the Court accepted Equitable's contention that its revenue derived from Delaware is insubstantial, Section 3104(c)(4) provides for jurisdiction if the defendant's conduct is persistent or regular in Delaware, irrespective of the substantiality of the revenue derived from the State. *Magid v. Marcal Paper Mills, Inc.,* 517 F.Supp. 1125, 1130 (D.Del.1981). As was previously stated, many of Equitable's activities in Delaware were persistent, regular, and continuous from at least 1978 to 1982. Consequently, Equitable is amenable to suit on this alternate prong of Section 3104(c)(4), notwithstanding Equitable's argument pertaining to substantiality. Therefore, the Court finds that service of process was proper under Section 3104(c)(4) and consequently that jurisdiction is also appropriate.

### B. *Venue*

Equitable also argues that venue is improper in Delaware under 12 U.S.C. § 94, the venue requirements for suits against national banking associations.[10] Former

---

**9.** Reply Memorandum of Defendant Equitable Bank, N.A. at 3.

**10.** Equitable has also argued that venue is improper under the securities laws, Section 22(a) of the 1933 Act (15 U.S.C. § 77v(a)) and Section 27 of the 1934 Act (15 U.S.C. § 78aa). The provisions of the sections are largely co-extensive and the somewhat broader provisions of the 1934 Act apply to all the claims. *Puma v. Marriott,* 294 F.Supp. 1116, 1120–1121 (D.Del. 1969). Section 27 provides for venue in any

Section 94 [11] provided:

Actions and proceedings against any association under this chapter may be had in any district or territorial court of the United States held within the district in which such association may be established, or in any State, county, or municipal court in the county or city in which said association is located having jurisdiction in similar cases.

Although this provision arguably could preclude suit in this district, it is clear that it has no bearing on the present case.

The factual circumstances governing issues of venue are determined as of the time the complaint was filed, *Lee v. Hunt,* 410 F.Supp. 329, 332 (M.D.La.1976); *see Sunbury Wire Rope Mfg. Co. v. United States Steel Corp.,* 230 F.2d 511, 512 (3d Cir.1956), or perhaps as of the time the cause of action arose. *Board of County Commissioners v. Wilshire Oil Co. of Texas,* 523 F.2d 125, 131 (10th Cir.1975). Equitable was not a national banking association at either the time the complaint was filed or when the cause of action arose.[12] Consequently, the fact that Equitable later became a national bank does not make the provisions of former Section 12 U.S.C. § 94 applicable.

Furthermore, 12 U.S.C. § 94 has been amended.[13] Section 94 now provides:

Any action or proceeding against a national banking association for which the Federal Deposit Insurance Corporation has been appointed receiver, or against the Federal Deposit Insurance Corporation as receiver of such association, shall be brought in the district or territorial court of the United States held within the district in which that association's principal place of business is located, or, in the event any State, county, or municipal court has jurisdiction over such an action or proceeding, in such court in the county or city in which that association's principal place of business is located.

96 Stat. 1512 (P.L. 97–320). This new venue provision repeals the requirements of former Section 94 except in cases involving a closed bank or a Federal Deposit Insurance Corporation receivership.

Absent special circumstances which are not present in this case, the amended version of Section 94 controls the venue issue presently before the Court. *See Denver & Rio Grande Western R.R. Co. v. Brotherhood of R.R. Trainmen,* 387 U.S. 556, 563, 87 S.Ct. 1746, 1750, 18 L.Ed.2d 954 (1967). Tested under the amended version of Section 94, venue would be proper in Delaware in this case even if Equitable is considered a national bank. Consequently, the Court finds that the provisions of 12 U.S.C. § 94 do not preclude suit in this jurisdiction.

### 3. *Statute of Limitations on the Securities Laws Claims*

Equitable's next argument is that this case should be dismissed against it because plaintiffs' securities laws claims are barred by the applicable statute of limitations.[14] Various federal and state statute of limitations are proffered as controlling plaintiffs'

---

district where the defendant transacts business. For the same reasons discussed concerning jurisdiction, venue is also appropriate because Equitable "transacts business" in Delaware as required under Section 27. *See Livingston v. Weis, Voisen, Cannon, Inc.,* 294 F.Supp. 676, 681 (D.N.J.1968); *see also United Industrial Corp. v. Nuclear Corp. of America,* 237 F.Supp. 971, 978–979 (D.Del.1964).

**11.** Section 94 was amended effective October 15, 1982. 96 Stat. 1512 (P.L. 97–320). The above quoted statute was in effect at the time this action was commenced.

**12.** *See* footnote 1, *supra.*

**13.** *See* footnote 11, *supra.*

**14.** Statute of limitations issues have not been raised concerning the pendent state law claims. It is Equitable's position that if the plaintiffs' federal securities laws claims are dismissed, the pendent claims must be dismissed for lack of subject matter jurisdiction. The Court concurs with Equitable on this point. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

claims. The issue is further complicated in that plaintiffs have alleged numerous violations of different portions of the securities laws, each with a different applicable limitations period, all in Count I.

A. *Plaintiffs' Claims Under Section 10(b) Of The 1934 Act and Rule 10b–5.*

Initially, the Court must determine the proper statute of limitations to apply to the 10b–5 claims. Although the federal securities laws contain explicit limitations provisions for those sections which expressly create civil remedies, there is no federal statute of limitations for an implied action under Rule 10b–5. *Hill v. Der,* 521 F.Supp. 1370, 1379 (D.Del.1981). Consequently, the timeliness of a suit alleging violations under Section 10(b) of the 1934 Act and Rule 10b–5 promulgated thereunder is determined by reference to the most closely analogous state law limitations period of the forum state, *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 210 n. 29, 96 S.Ct. 1375, 1389 n. 29, 47 L.Ed.2d 668 (1976), including any "borrowing statute." *See Robertson v. Seidman & Seidman,* 609 F.2d 583, 586 (2d Cir.1979); *Arneil v. Ramsey,* 550 F.2d 774, 779 (2d Cir.1977); *Gluck v. Amicor, Inc.,* 487 F.Supp. 608, 612 (S.D.N.Y.1980).

The Delaware "borrowing statute," 10 *Del.C.* § 8121 provides:

Where a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such cause of action after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose, for bringing an action upon such cause of action. Where the cause of action originally accrued in favor of a person who at the time of such accrual was a resident of this State, the time limited by the law of this State shall apply.

Four of the Wilmington House plaintiffs, Virgil Scott, Marie Scott, Thomas Ruger, and Patricia Ruger are Pennsylvania residents. The remaining Wilmington House plaintiffs, John T. Hill and Descomp, Inc.[15] are Delaware residents. By its terms, the borrowing statute is inapplicable to the plaintiffs Hill and Descomp, Inc. because of their Delaware residency. The borrowing statute may be applicable to the 10b–5 claims of the Scotts and Rugers, however, if their cause of action arose outside of Delaware. If the plaintiffs' cause of action arose outside of Delaware, a different statute of limitations will apply to the 10b–5 claims of the non-Delaware residents as opposed to the Delaware residents. Therefore, the Court will first decide the applicable statute of limitations for the 10b–5 claims of the non-Delaware residents, and then proceed to determine the applicable limitations period for the Delaware plaintiffs.

(i) *Virgil Scott, Marie Scott, Thomas Ruger and Patricia Ruger (Pennsylvania residents)*

The litigants agree that the 10b–5 claims of the Scotts and Rugers (collectively "non-resident plaintiffs") are governed by reference to the applicable statute of limitations of the state where their cause of action arose under 10 *Del.C.* § 8121. *See Robertson v. Seidman & Seidman,* 609 F.2d at 586. The non-resident plaintiffs contend, however, that their cause of action arose in Delaware and therefore Delaware limitations law applies. The defendants conversely argue that the plaintiffs' cause of action arose in Maryland and therefore the non-resident plaintiffs' claims are governed by the limitations law of Maryland. Into this controversy the Court at oral argument interjected the possibility that the limitations law of Pennsylvania, the state where the Scotts and Rugers reside, may govern

---

15. Descomp, Inc. is incorporated in Delaware and has its principal place of business in Bear, Delaware. For purposes of the borrowing statute, it is a Delaware resident. *See D'Angelo v. Petroleos Mexicanos,* 398 F.Supp. 72, 79 (D.Del.1975).

the non-resident plaintiffs' claims. Consequently a determination of which statute of limitations governs the non-resident plaintiffs' 10b–5 claims may be accomplished only by deciding where the non-resident plaintiffs' claims arose for purposes of 10 *Del.C.* § 8121.

■ In determining where the plaintiffs' cause of action arose for purposes of Section 8121, the Court must make a similar analysis to that made when making a substantive choice of law decision. *Dymond v. National Broadcasting Co., Inc.,* 559 F.Supp. 734 at 737, (D.Del.1983); *see also Sack v. Low,* 478 F.2d 360, 365 (2d Cir.1973). Delaware courts, when confronted with a substantive choice of law situation in a tort action will apply the law of the *lex loci delecti, i.e.,* the law of the state where the tort or injury occurred. *Dymond v. National Broadcasting Co., Inc.,* at 737; *Thornton v. Carroll,* 490 F.Supp. 455, 457 (D.Del.1980). In contract cases, however, the Delaware courts have abandoned the older *lex loci delecti* standard and have utilized the more modern and flexible "most significant relationship to the transaction" test set forth in the *Restatement (Second) Conflict of Laws* § 188(1). *See Process and Storage Vessels, Inc. v. Tank Service, Inc.,* 541 F.Supp. 725, 729 (D.Del.1982); *Sellon v. General Motors Corp.,* 521 F.Supp. 978, 981 (D.Del.1981); *Oliver B. Cannon and Son, Inc. v. Dorr-Oliver, Inc.,* 394 A.2d 1160, 1166 (Del.1978). The plaintiffs' statutory cause of action arising under 10b–5 is not clearly a tort or contract action for choice of law purposes, and indeed involves elements of both.[16] It is irrelevant, however, whether the court applies the *lex loci delecti* or the "most significant relationship" test for purposes of the borrowing statute because in either case Maryland limitations law will govern the non-resident plaintiffs' claims.

In a traditional *lex loci delecti* analysis, the injury occurs not where the wrong

takes place but rather where the wrong caused the injury or loss. *See Autrey v. Chemtrust Industries Corp.,* 362 F.Supp. 1085, 1090 (D.Del.1973). This is so because injury is the last act necessary for a cause of action to arise. *See George v. Douglas Aircraft Co.,* 332 F.2d 73, 79 (2d Cir.), *cert. denied,* 379 U.S. 904, 85 S.Ct. 193, 13 L.Ed.2d 177 (1964). Consequently, it has been held that in an action for fraud under 10b–5, the cause of action arises where the economic impact is felt, normally where the plaintiff resides. *Arneil v. Ramsey,* 550 F.2d 774, 779 (2d Cir.1977), *quoting Sack v. Low,* 478 F.2d 360, 366 (2d Cir.1973). This rigid application of the *lex loci delecti* test, which would require that the non-resident plaintiffs' claims be governed by Pennsylvania limitations law (their place of residence), has been found inapplicable by this Court in the companion case to the one *sub judice. See Hill v. Der,* 521 F.Supp. at 1378 n. 5.

■ There are sound reasons why this Court did not apply Pennsylvania limitations law to the non-resident plaintiffs' 10b–5 claims. The application of the place of injury rule under Delaware choice of law principles is appropriate only in the case of negligent torts. *Johnston Associates, Inc. v. Rohm & Haas Co.,* 560 F.Supp. 916, at 918, (D.Del.1983); *see Marra v. Bushee,* 317 F.Supp. 972, 974 (D.Vt.1970), *aff'd in relevant part, reversed in part,* 447 F.2d 1282, 1283 (2d Cir.1971). In the case of intentional torts, Delaware courts have preferred to apply the law of the defendant's place of conduct rather than the place of injury.[17] *Johnston Associates, Inc.,* at 918; *accord, Marra v. Bushee,* 447 F.2d 1282, 1283 (2d Cir.1971). This distinction is made because when the compensatory element is dominant, as it is in the ordinary negligence action, the place of the injury rule is appropriate. However, in an intentional tort ac-

---

**16.** The action relates to both fraud (tort) and a contract for the sale of securities.

**17.** To the extent a 10b–5 action is equivalent to a tort, it must be considered an intentional tort

because of the scienter requirement. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1380, 47 L.Ed.2d 668 (1976).

tion, where this compensatory factor is secondary and the punitive element is dominant, "a state finds conduct wrongful because its people regard it as sinful or offensive to public morals, and the conduct, not the injury, is critical for applying the applicable law." *Marra v. Bushee,* 317 F.Supp. at 974. Consequently, the Court finds that under the *lex loci delecti* test, the cause of action arose in this case at the primary place of the defendants' wrongful conduct. *Johnston Associates, Inc.,* at 918; *see Hill v. Der,* 521 F.Supp. at 1378 n. 5, *cf., Marra v. Bushee,* 447 F.2d 1282, 1283 (2d Cir.1971).

■ There can be no doubt that the primary place of Equitable's wrongful conduct was Maryland. The gravamen of the plaintiffs' complaint against Equitable is two-fold. First, the plaintiffs' allege that Equitable employees were bribed to approve loans to the plaintiffs in connection with their investment in Wilmington House. Second, the plaintiffs' claim that Equitable wrongfully failed to disclose to the plaintiffs that said employees accepted such bribes.

Plaintiffs admit that Equitable made the loans in question in Maryland.[18] The plaintiffs also admit that Equitable accepted repayment of the loans in Maryland.[19] In addition, because the nature of the plaintiffs' claim is based upon Equitable's failure to disclose, such failure can be said to occur only where the bank is located, which is also Maryland. In sum, Maryland limitations law should apply because most, if not all, of Equitable's alleged wrongful conduct occurred in Maryland.

The choice of Maryland limitations law is even more compelling under the "most significant relationship" test set forth in the *Restatement (Second) Conflict of Laws* § 188(1) at 575 (1971). *See Process and Storage Vessels, Inc. v. Tank Service, Inc.,* 541 F.Supp. at 729. Section 188(1) provides in relevant part:

(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties....

Application of the *Restatement* test reveals clearly that Maryland has a greater interest than Delaware or Pennsylvania in the resolution of the plaintiffs' claims. *See Sellon v. General Motors Corp.,* 521 F.Supp. at 982 (law of state with larger stake in legal issues should govern).

As previously stated, both the loans and the repayment of the loans were made in Maryland. In addition, Equitable's alleged failure to disclose occurred in Maryland. Furthermore, Equitable's principal place of business is in Maryland, and Maryland has a substantial interest in the conduct of banks located within the state. *See also Restatement (Second) Conflict of Laws,* § 188(2)(e) at 575 (1971).

In addition to the direct activities of Equitable, many other factors point to Maryland as the proper choice of law under a most significant relationship test. For example, the money Equitable loaned to the plaintiffs was invested in Wilmington House, a Maryland limited partnership. The general partners of Wilmington House were Lee P. Der, Inc., and David E. Karr, both Maryland residents. The broker-dealer that offered the limited partnerships was D & S Financial, also a Maryland corporation. In short, the underlying investment for which the Equitable loan was used was principally a Maryland investment promoted by Maryland residents.

In response to these numerous factors which point toward the application of Maryland limitations law, the plaintiffs offer two arguments. First, the plaintiffs properly state that the court in *Hill v. Der* found that the plaintiffs' claims in that case arose in Delaware. 521 F.Supp. at 1378 n.

**18.** Plaintiffs' Brief at 17.

**19.** Plaintiffs' Brief at 17.

5. Consequently, because the same securities are at the core of this case as in *Hill v. Der,* the plaintiffs argue that Delaware law is applicable. The obvious flaw in the plaintiffs' argument is that the defendants in *Hill v. Der* are not the same as in this case. In the instant case, two Maryland banks are the defendants, and this changes the choice of law calculus. Therefore, the fact that Delaware limitations law applied in *Hill v. Der* is irrelevant in deciding the current issue.

The second argument the plaintiffs make in support of a Delaware choice of law is that some of the actions pertaining to the plaintiffs' claims occurred in Delaware, and the result of Equitable's misconduct impacted in Delaware. Although the affidavits of Thomas Ruger and Virgil Scott indicate that some events relating to this case took place in Delaware, such events constituted an insignificant part of the overall relationship between the plaintiffs and Equitable. Furthermore, the place where Equitable's actions impacted is not determinative in a choice of law decision, and indeed under the Court's *lex loci delecti* analysis is irrelevant.[20] Therefore, the Court holds that Maryland limitations law will govern the 10b–5 claims of the plaintiffs Virgil and Marie Scott and Thomas and Patricia Ruger.

In determining which Maryland limitations law to borrow, the Court must bear in mind the purpose of the Delaware borrowing statute. 10 *Del.C.* § 8121 was enacted to prevent forum shopping. *Dymond v. National Broadcasting Co., Inc.,* at 736; *Pack v. Beech Aircraft Corp.,* 132 A.2d 54, 57 (Del.1957). Therefore, the plaintiffs' 10b–5 claims should be cognizable in Delaware only if they could have been brought in Maryland. Consequently, this Court must apply the same statute of limitations to the non-resident plaintiffs' 10b–5 claims as would have been applied to such claims had they been brought in Maryland. *See Gluck v. Amicor, Inc.,* 487 F.Supp. 608, 612–613 (S.D.N.Y.1980).

In Maryland, the statute of limitations found in Maryland's Blue Sky law, Md. Corps. & Ass'ns. Code Ann. § 11–703(f), is applied to actions arising under Section 10(b) and Rule 10b–5. *O'Hara v. Kovens,* 625 F.2d 15, 18 (4th Cir.1980), *cert. denied,* 449 U.S. 1124, 101 S.Ct. 939, 67 L.Ed.2d 109 (1981). Section 11–703(f) provides:

(1) A person may not sue under this section after the earliest to occur of three years after the contract of sale or purchase or the time specified in paragraph (2) of this subsection.

(2) An action may not be maintained: (i) To enforce any liability created under subsections (a)(1)(i) or (a)(2)(i) of this section, unless brought within one year after the violation on which it is based; or (ii) To enforce any liability created under subsections (a)(1)(ii) or (a)(2)(ii) of this section, unless brought within one year after the discovery of the untrue statement or omission, or after the discovery should have been made by the exercise of reasonable diligence.

Thus, a 10b–5 action in Maryland may not be brought later than one year after a reasonable date of discovery or three years after the contract of sale, whichever occurs first. *See O'Hara v. Kovens,* 625 F.2d at 17. This limitations criteria will apply to the non-resident plaintiffs' 10b–5 claims against Equitable as they relate to the Wilmington House transaction.[21]

---

**20.** In any event, if impact analysis was appropriate, it would point to a Pennsylvania choice of law result for the non-resident plaintiffs, not Delaware. *See,* p. 1334, *supra.* This result was rejected in *Hill v. Der,* 521 F.Supp. at 1378 n. 5.

**21.** A similar result was recently reached by Judge Stapleton in *Dofflemeyer v. W.F. Hall* *Printing Co.,* 558 F.Supp. 372 (D.Del.1983). In *Dofflemeyer,* the Court analyzed the affect of the borrowing statute on a 10b–5 claim arising in California, and concluded that the provisions of Cal.Civ.Proc.Code § 338(4) (limitations period for fraud) would apply. At 378–379. The result in *Dofflemeyer* is in accord with the result reached in this case because the Ninth Circuit Court of Appeals, contrary to the

*(ii) John T. Hill and Descomp, Inc.*

■ Delaware limitations law will govern the 10b–5 claims of the Delaware residents, Hill and Descomp, Inc., against Equitable. *Ernst & Ernst v. Hochfelder,* 425 U.S. at 210 n. 29, 96 S.Ct. at 1389 n. 29. In determining which limitations period to apply, the Court is faced with two alternative choices. The first alternative is to apply the two-year limitations period that governs actions under the Blue Sky laws, set forth at 6 *Del.C.* § 7323(e). The second alternative is to apply the statute of limitations for fraud set forth at 10 *Del.C.* § 8106, which provides for a three-year period. Although most Circuit Court of Appeals have firmly established which of these alternatives govern a 10b–5 claim, *compare Clegg v. Conk,* 507 F.2d 1351, 1353 (10th Cir.1974) (statute of limitations for fraud applies), *cert. denied,* 422 U.S. 1007, 95 S.Ct. 2628, 45 L.Ed.2d 669 (1975); *United California Bank v. Salik,* 481 F.2d 1012, 1015 (9th Cir.) (same), *cert. denied,* 414 U.S. 1004, 94 S.Ct. 361, 38 L.Ed.2d 240 (1973), *with O'Hara v. Kovens,* 625 F.2d 15, 18 (4th Cir.1980) (statute of limitations for Blue Sky actions applies), *cert. denied,* 449 U.S. 1124, 101 S.Ct. 939, 67 L.Ed.2d 109 (1981); *Forrestal Village, Inc. v. Graham,* 551 F.2d 411, 413 (D.C.Cir.1977) (same); *Parrent v. Midwest Rug Mills, Inc.,* 455 F.2d 123, 126 (7th Cir.1972) (same); *Vanderboom v. Sexton,* 422 F.2d 1233, 1237–1239 (8th Cir.) (same), *cert. denied,* 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970), the approach taken by the United States Court of Appeals for the Third Circuit requires a case by case determination of which limitations period should govern a particular action.

The Third Circuit's approach for selecting the appropriate state statute of limitations in a 10b–5 action is set forth in *Roberts v. Magnetic Metals Co.,* 611 F.2d 450 (3d Cir.

1979) and *Biggans v. Bache Halsey Stuart Shields, Inc.,* 638 F.2d 605 (3d Cir.1980). Judge Latchum in *Hill v. Der,* 521 F.Supp. at 1379–1385, and Judge Stapleton in *Dofflemeyer v. W.F. Hall Printing Co.,* at 376–377, have fully explored the Third Circuit's approach in *Roberts* and *Biggans,* and it is not necessary for this Court to duplicate that analysis. Judge Latchum has succinctly set forth the guidelines to be followed in this area as follows:

> It is safe to assume that the Third Circuit adheres to the rudimentary principle that when alternative limitations period are supplied by state law, the court must select the state statute of limitations which best comports with the substantive federal policies advanced by Rule 10b–5. Likewise the Court of Appeals has indicated that the concurrent operation of the federal and state securities statutes makes the Blue Sky statute of limitations in most cases the logical candidate for regulating 10b–5 claims. This presumption, however, is subject to one significant exception. If the underlying state Blue Sky law does not afford a civil damage action to remedy the behavior challenged by the 10b–5 claim and the plaintiff would be relegated to a common law fraud action for state relief, the courts must apply the fraud limitations provisions to the 10b–5 action.

*Hill v. Der,* 521 F.Supp. at 1383 (citations omitted). Similarly, Judge Stapleton has concluded:

> It is clear from these two cases (*Roberts* and *Biggans*) that where a plaintiff has no remedy under the state's Blue Sky law, but the operative facts alleged in the complaint give rise to a claim under the state's common law, it is the limitations period applicable to a common law claim rather than the Blue Sky period which governs federal claims under Rule 10b–5.

---

Fourth Circuit in *O'Hara v. Kovens,* has held that the statute of limitations for fraud governs 10b–5 actions arising in California and not the limitations period provided for in the Blue Sky laws. *See United California Bank v. Salik,* 481 F.2d 1012, 1015 (9th Cir.), *cert. denied,* 414 U.S.

1004, 94 S.Ct. 361, 38 L.Ed.2d 240 (1973). In all cases, the proper application of the Delaware borrowing statute requires the Court to borrow the statute of limitations that would govern the 10b–5 action where it arose. *See Gluck v. Amicor, Inc.,* 487 F.Supp. at 612–613.

*Dofflemeyer v. W.F. Hall Printing Co.,* at 377. Consequently, if the operative facts in this case would give rise to a Delaware Blue Sky cause of action, the limitations period under the Blue Sky laws would govern the resident plaintiffs' 10b–5 claim. If the facts do not present an actionable claim under the Blue Sky laws, the statute of limitations period for fraud will control.

The provisions of the Delaware Blue Sky law are drawn in part from the Uniform Securities Statute. The only civil damage remedy available to a private litigant is set forth in 6 *Del.C.* § 7323,[22] which is modeled after Section 12(2) of the Federal Securities Act of 1933. *Hill v. Der,* 521 F.Supp. at 1383. Only those persons who "offer, sell, or purchase" the security to the injured person are liable under Section 7323.[23] Furthermore, Section 7323 does not set forth a remedy in damages for a defrauded purchaser or seller, but rather provides only for an action of recision.

In this case, no action would lie against Equitable under the Blue Sky laws because Equitable did not offer any security to the plaintiffs, nor did it sell to or purchase from the plaintiffs any security. Furthermore, an action for recision is similarly inappropriate because the plaintiffs and Equitable

did not have a contract for the purchase or sale of securities. Consequently, there is nothing to rescind. Therefore, the Court finds that the operative facts in this case do not give rise to a cause of action under the Delaware Blue Sky laws.

Because the plaintiffs would have no cause of action under the Blue Sky laws, the two-year statute of limitations period provided for in 6 *Del.C.* § 7323(e) is not applicable. *Dofflemeyer v. W.F. Hall Printing Co.,* at 377. As such, the Delaware statute of limitations for fraud, 10 *Del.C.* § 8106, governs the 10b–5 claims of Hill and Descomp, Inc. against Equitable. *Id.* Section 8106 provides:

No action to recover damages for trespass, no action to regain possession of personal chattels, no action to recover damages for the detention of personal chattels, no action to recover a debt not evidenced by a record or by an instrument under seal, no action based on a detailed statement of the mutual demands in the nature of debit or credit between parties arising out of contractual or fiduciary relations, no action based on a promise, no action based on a statute, and no action to recover damages caused by an injury unaccompanied with force or

---

**22.** Section 7323 provides in relevant part:

(a) Any person who:

(2) Offers, sells or purchases a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they are made, not misleading (the buyer or seller not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known of the untruth or omission, is liable to the person buying or selling the security from or to him, who may sue either at law or in equity to recover the consideration paid for the security, together with the interest at the legal rate from the date of payment costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security.

(b) Every person who directly or indirectly controls a seller or buyer liable under subsection (a), every partner, officer, or director of

such a seller or buyer, every person occupying a similar status or performing similar functions, every employee of such seller or buyer who materially aids in the sale, and every broker-dealer or agent who materially aids in the sale or purchase are also liable jointly and severally with and to the same extent as the seller or buyer, unless the nonseller or nonbuyer who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There is contribution as in cases of contract among the several persons so liable.

**23.** The language of Section 7323 is more limited than 6 *Del.C.* § 7303, which makes it unlawful for any person "in connection with the offer, sale or purchase" of any security to use fraudulent schemes or devices. Section 7303, which is very similar to Rule 10b–5, does not provide for a civil damage remedy. *Hill v. Der,* 521 F.Supp. at 1383.

resulting indirectly from the act of the defendant shall be brought after the expiration of 3 years from the accruing of the cause of such action; subject, however, to the provisions of §§ 8108–8110, 8119 and 8127 of this title.

Under the terms of Section 8106, a three-year statute of limitations period will apply to the 10b–5 claims of Hill and Descomp, Inc. against Equitable.

### (iii) Date of the Purchase of Securities

Although the Court has determined the appropriate statute of limitations for both the non-resident and resident plaintiffs, it must still determine when the plaintiffs' cause of action accrued before it can assess the timeliness of the 10b–5 claims contained in Count I. It is clear that under Rule 10b–5, which proscribes fraud *"in connection with* the purchase or sale of any security," the plaintiffs' 10b–5 action against Equitable accrued at the time of purchase of the Wilmington House limited partnership.

In *Hill v. Der,* the Court applied the "investment decision" analysis of *Goodman v. Epstein,* 582 F.2d 388 (7th Cir.1978), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979) and concluded that under the *Goodman* doctrine the plaintiffs' 10b–5 claim accrued on February 1, 1980, or perhaps as late as January and February of 1981, when the final payments were made to Equitable on the letters of credit.[24] *See Hill v. Der,* 521 F.Supp. at 1385–1387. This ruling was made in connection with the *Hill v. Der* defendants' motion to dismiss made pursuant to Fed.R.Civ.P. 12(b)(6).[25]

The Court in *Hill v. Der* was determining on which date the Wilmington House limit-

ed partnerships were purchased and sold. It is in connection with these same partnerships that Equitable allegedly committed the 10b–5 violation. The Court finds the analysis in *Hill v. Der* to be persuasive, and the result to be correct. Consequently, at this juncture it is assumed that the plaintiffs' 10b–5 claim against Equitable relating to Wilmington House arose on February 1, 1980, or perhaps even as late as early 1981.[26] This date is subject to revision upon the full development of the facts in this case.

▮ The Complaint in this case was filed on April 30, 1982. For the Delaware plaintiffs Hill and Descomp, Inc., the Complaint was timely filed under 10 *Del.C.* § 8106.[27] The situation of the non-resident plaintiffs, however, is somewhat different. As previously rehearsed, the provisions of Md.Corps. & Ass'ns. Code Ann. § 11–703(f) govern the non-resident plaintiffs' 10b–5 claim. Under the perimeters of Section 11–703(f), the plaintiffs' action must be filed within one year after a reasonable date of discovery of the cause of action or three years after the contract of sale, whichever is earlier. *See O'Hara v. Kovens,* 625 F.2d at 17. Although the action was filed within the three year outside limit of Section 11–703(f), it was not filed within one year after the cause of action accrued.[28]

▮ Section 11–703(f) is patterned after Section 13 of the Federal Securities Act of 1933. Section 13, like Section 11–703(f), imposes a standard of reasonable diligence on the part of the plaintiff to discover the fraud, and requires the plaintiff to file suit when the possibility of fraud becomes ap-

---

**24.** Exhibit G to Plaintiffs' Brief.

**25.** Because the Court in *Hill v. Der* ruling was made on a motion to dismiss, all the facts alleged on the plaintiffs' complaint were accepted as true, and any inferences favorable to the plaintiffs were drawn. *Hill v. Der,* 521 F.Supp. at 1386. Ultimately, once further facts are developed, it may be found that the plaintiffs' cause of action accrued much earlier.

**26.** These early 1981 dates vary for the different plaintiffs. *See* Plaintiffs' Brief at 28 n. 13.

**27.** The three-year statutory period under Section 8121 means that the action was timely if the cause of action accrued after April 30, 1979.

**28.** The latest possible date that the cause of action accrued for any of the plaintiffs was February 28, 1981. This date is more than one year before April 30, 1982, the date this action was commenced.

parent. *See Ingenito v. Bermec Corp.*, 441 F.Supp. 525, 554 (S.D.N.Y.1977), *quoting Klein v. Shields & Co.*, 470 F.2d 1344, 1347 (2d Cir.1972). At this point, the Court cannot hold as a matter of law that plaintiffs, in the exercise of reasonable diligence, should have known of their 10b–5 claim before April 30, 1981. This issue can be decided only by the trier of facts. *See Kubik v. Goldfield*, 479 F.2d 472, 477 n. 12 (3d Cir.1973).

Nonetheless, it is incumbent upon the plaintiffs to properly plead why they did not discover the fraud within one year after it occurred. *See Cook v. Avien, Inc.*, 573 F.2d 685, 695 (1st Cir.1978) (applying Section 13 of the 1933 Act), *quoting* 3 L.Loss, *Securities Regulation*, Ch. 11C(1)(f)(ii) at 1744 (2d ed. 1961). The plaintiffs in this case have merely stated in conclusory fashion that they could not have discovered the fraud until March 20, 1982.[29] This is insufficient to satisfy the pleading requirements under Section 11–703(f). Although the plaintiffs have set forth the time and circumstances when they did learn of the fraudulent conduct, they must also allege in their complaint why discovery was not made earlier. *See Brick v. Dominion Mortgage & Realty Trust*, 442 F.Supp. 283, 292 (W.D.N.Y.1977). In addition, the plaintiffs must set forth the diligent efforts they made to unearth the fraud. *See id.* Consequently, the non-resident plaintiffs' 10b–5 claim against Equitable will be dismissed unless the Complaint is properly amended to satisfy the pleading requirements imposed by Section 11–703(f) of the Maryland Blue Sky law. *See Hill v. Der*, 521 F.Supp. at 1389.

### B. *Plaintiffs' Claims Under Sections 15 And 17 Of The 1933 Act And Sections 15 And 20(a) Of The 1934 Act.*

The plaintiffs, in Count I, also allege that Equitable violated Sections 15 and 17 of the 1933 Act and Sections 15 and 20(a) of the 1934 Act. Initially, for reasons more fully explained below, the portion of Count I based upon Section 17 of the 1933 Act and *Section 15 of the 1934 Act* will be dismissed on other grounds. Consequently, there is no need to discuss the statute of limitations applicable to those claims. The only issue, therefore, is whether the claims based upon *Section 15 of the 1933 Act* and Section 20(a) of the 1934 Act are barred under the applicable statute of limitations.

Section 15 of the 1933 Act[30] and Section 20(a) of the 1934 Act[31] establish liabilities of controlling persons. In essence these sections make liable persons who exercise control over other persons or entities that violate the securities laws. These provisions make the control person liable to the same extent as the violator that they controlled. *See* 15 U.S.C. §§ 77o, 78t(a). For example, if Equitable was found to "control" a party that violated Rule 10b–5, Eq-

---

**29.** Complaint ¶ 14 at 4.

**30.** Section 15 provides:

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under Sections 11 or 12, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist. 15 U.S.C. § 77o.

**31.** Section 20(a) provides:

Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action. 15 U.S.C. § 78t(a).

uitable would be equally liable for that same violation because of Section 20(a).[32]

■ Liability under both Sections 15 (1933 Act), and 20(a) (1934 Act) is in reality derivative liability in that it is predicated upon another person's violation of a different provision of the securities laws. Consequently, the statute of limitations that governs a claim under Sections 15 and 20(a) will be the same as the limitations period that governs the claim against the "controlled" person. *See Herm v. Stafford,* 663 F.2d 669, 679 (6th Cir.1981). As the Court in *Herm v. Stafford* stated:

> Since the liability of the controlling person is joint and several with the controlled person, the same limitations period logically applies to the controlling person.

*Id.* (citation omitted).

■ The problem at this juncture is that the Complaint is wholly indecipherable as to whom Equitable is supposed to have controlled. Nonetheless, Section 15 limits controlling person liability to violations by the controlled person of either Section 11 or 12 of the 1933 Act (15 U.S.C. §§ 77k, 77*l*). A claim based upon Section 11 or 12 is governed by the limitations period provided for in Section 13 (15 U.S.C. § 77m) of the 1933 Act. Section 13 provides:

> No action shall be maintained to enforce any liability created under section 11 or section 12(2) unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 12(1), unless brought within one year after the violation upon which it is based. In no event shall any such action be brought to enforce a liability

created under section 11 or section 12(1) more than three years after the security was bona fide offered to the public, or under section 12(2) more than three years after the sale.

It is this limitations period that will govern the plaintiffs' Section 15 claim.

It is not possible, however, to determine what limitations period governs the plaintiffs' Section 20(a) claim. Section 20(a) provides for controlling person liability in reference to any violation of the 1934 Act or a rule or regulation promulgated thereunder. 15 U.S.C. § 78t(a). Consequently, the Court cannot determine which limitations period governs this claim until the plaintiffs delineate who Equitable allegedly controlled and what provision of the securities laws that person violated.

Furthermore, the Court is also unable to determine at this point on which date the statute of limitations began to run on the Sections 15 and 20(a) claims. First, it is wholly unclear to the Court what the nature of these claims are. Second, the parties have not discussed in their briefs whether or not the *Goodman v. Epstein* "investment decision" doctrine that was adopted in *Hill v. Der* is relevant to claims not rooted in Section 10(b) or Rule 10b–5. The Court will not decide this issue until it becomes clear that the plaintiffs have a viable claim under either Section 15 or 20(a), and the parties have fully briefed this issue. Consequently, the Court must reserve judgment on whether the plaintiffs' claims under Sections 15 and 20(a) are barred by the applicable statute of limitations. The plaintiffs will be given leave to amend their complaint to properly set forth these claims.[33]

## EAGLE ASSOCIATES

### 1. *Factual Background*

Eagle was a limited partnership organized and existing under the laws of the

---

**32.** The word "control" is used here as that term is understood within the ambit of Section 20(a). *See Sharp v. Lybrand,* 649 F.2d 175, 185 (3d Cir.1981), *cert. denied,* 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982).

**33.** In their Complaint, the plaintiffs should plead their claims governed by Section 13 of the 1933 Act in the same manner indicated by the Court for the 10b–5 claims governed by Section 11–703(f) of the Maryland Blue Sky law. *See* pp. 1339–1340, *supra.*

State of Maryland, with its offices in Pikesville, Maryland. Eagle was organized to engage in the leasing of coal lands in Boone County, West Virginia. Eagle also engaged in the mining and selling of coal in Boone County. The general partners of Eagle were Der-Mas, Inc., a Maryland corporation, and Roger W. Ball, a resident of West Virginia. Lee P. Der, a Maryland resident owned 60% of the shares of the general partner Der-Mas, Inc. The remaining 40% of the shares of Der-Mas, Inc. were owned by Martin E. Mason, also a Maryland resident.

In mid-October, 1978, Der[34] offered to sell to the plaintiffs, Data Control North, Inc. (hereinafter "DCN"), Virgil Scott, Marie Scott, Thomas Ruger, and James Stritzinger (collectively "Eagle plaintiffs"), limited partnership interests in Eagle. On November 2, 1978, DCN, Virgil and Marie Scott, and Thomas Ruger purchased limited partnership shares in Eagle. Similarly, on November 30, 1978, James Stritzinger purchased one and one-half shares of Eagle. The limited partnership agreement required each plaintiff to make a cash down payment towards the purchase price. The agreement further provided that additional installment payments were to be made.[35] Each of these installment payments were to be secured by irrevocable letters of credit drawn for the benefit of Eagle.

Prior to November 2, 1978, DCN, Virgil and Marie Scott, and Thomas Ruger applied for and received unsecured loans from Mercantile to finance a portion of their initial subscription payment for their limited partnership interests in Eagle. At the time of the unsecured loan applications, these four plaintiffs also applied to Mercantile for the required letters of credit. Mercantile rejected the plaintiffs' application for such letters. Consequently, because of their failure to obtain the needed letters of credit, these four plaintiffs paid the entire balance due on their partnership interests by March 20, 1979.

Prior to his investment in Eagle, the plaintiff James R. Stritzinger applied for and received an unsecured loan from Equitable to partially finance the down payment on his limited partnership shares. Also at that time, and again on December 29, 1978, Stritzinger applied for the requisite letters of credit with Equitable. Subsequently, Equitable approved Stritzinger's application, and he received the desired letters of credit drawn in favor of Eagle.

The plaintiffs allege that certain employees of Mercantile, most notably Peter R. Wilkes, accepted bribes from Lee P. Der to approve the plaintiffs' applications for unsecured loans and letters of credit in connection with Eagle. On information and belief, the plaintiffs further allege that sometime after the unsecured loans were approved, certain officials of Mercantile learned of the bribes and therefore refused to issue letters of credit to the plaintiffs. In addition, plaintiffs allege that Mercantile discharged the bribed employees. Mercantile, however, never informed the plaintiffs of the bribes, nor the subsequent discharge of the bribed employees.

The plaintiff Stritzinger similarly claims that Equitable employees accepted bribes from Lee P. Der to approve his unsecured loans and letters of credit. Stritzinger further claims that when Equitable learned of the dishonesty of the bribed employees, said employees were discharged. Equitable never informed Stritzinger of any of these events.

The fate of Eagle is not fully detailed in the record before the Court. It appears, however, that Eagle was not able to sell its

---

**34.** Again actually several people were allegedly involved in the sale of the partnership interests to the plaintiffs. *See* Complaint Appendix, ¶ 71 at 31. For convenience, Der is referred to singly to represent this group of alleged wrongdoers. *See* footnote 5, *supra*.

**35.** The payments were to be made on June 1, 1979 and June 1, 1980.

coal, nor generate income as expected.[36] In mid-May, 1979, it became apparent to the plaintiffs that their investment in Eagle was not sound.[37] Nonetheless, on June 1, 1979, Stritzinger tendered the required installment payment on his Eagle investment.[38] Subsequently, it appears that Eagle failed, causing substantial financial losses to these plaintiffs.[39]

In late February 1981, Stritzinger wrote to the Maryland State Bank Commissioner raising questions about the propriety of Equitable's actions in connection with Eagle. The letter was forwarded to Equitable Vice President and Counsel Martin B. Ellis. In a letter of March 10, 1981, Ellis informed Stritzinger that there had been no impropriety or wrongdoing on the part of any Equitable employee in connection with the Eagle transaction.

In a letter of March 13, 1981, Virgil Scott made inquiries to Mercantile concerning the Eagle venture. Specifically, Scott inquired whether any employees of Mercantile were dismissed in connection with the Eagle loans. Mercantile President Bruce P. Wilson responded to Scott's letter, and indicated that no dismissals occurred because of the Eagle transaction. The Wilson letter answered other questions presented by Scott, and generally indicated that nothing abnormal had occurred at Mercantile in connection with the Eagle loans.

On March 20, 1982, Thomas Ruger received a telephone call from Martin E. Mason, a defendant in *Hill v. Der,* in which Mason allegedly informed Ruger that kickbacks had been paid by Der to employees of Mercantile and Equitable in connection with Eagle. Shortly thereafter, Ruger, along with Virgil Scott, met with Mason

who allegedly informed them of some of the specifics of the kickback scheme. Subsequently, this action was filed against Mercantile and Equitable on April 30, 1982.

**2.  Statute Of Limitations On The Securities Laws Claims**

**A.  DCN, Virgil Scott, Marie Scott, Thomas Ruger**

Mercantile argues that the plaintiffs' securities law claims should be dismissed against it because such claims are barred by the applicable statute of limitations. As was the case with Wilmington House, various federal and state statute of limitations are arguably applicable to the plaintiffs' securities laws claims against Mercantile in connection with Eagle. Once again, the issue is blurred because the plaintiffs have alleged numerous violations of the securities laws in Count V, each with a different limitations period. The Court finds it unnecessary at this time to ascertain which statute of limitations governs the securities law claims of DCN, Virgil and Marie Scott, and Thomas Ruger, however, because such claims are barred under any potentially relevant limitations period.

These plaintiffs claim that the unsecured Mercantile loans were obtained before November 2, 1978.[40] It is undisputed that all these plaintiffs paid in full for their Eagle limited partnerships on or before March 20, 1979.[41] It is also clear that the three year limitations period of 10 *Del.C.* § 8106 provides for the greatest amount of time to bring a cause of action. Assuming *arguendo* that Section 8106 governs all of the plaintiffs' securities laws claims against Mercantile,[42] this case must have been

---

**36.**  Complaint Appendix, ¶ 80(b) at 35. The Appendix is part of the Complaint through reference. *See* Plaintiffs' Brief at 22.

**37.**  Complaint Appendix, ¶ 83 at 37.

**38.**  *Id.,* ¶ 75 at 33.

**39.**  *Id.,* ¶ 84 at 37.

**40.**  Complaint ¶ 63 at 17.

**41.**  Complaint Appendix ¶ 78(c) at 34.

**42.**  This of course is not possible for the claims not relating to Section 10(b) of the 1934 Act and Rule 10b–5 promulgated thereunder.

brought by March 20, 1982. The Complaint, however, was not filed until April 30, 1982. Consequently, the claims against Mercantile are time barred unless the principle of equitable tolling is applied.

■ Equitable tolling is a principle that delays the running of the statutory period when a party injured by fraud remains in ignorance of the fraud without any fault or want of diligence on his part. *Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946), *quoting Bailey v. Glover,* 88 U.S. (21 Wall.) 342, 348, 22 L.Ed. 636 (1874). In this case, the plaintiffs' claims are time barred if the limitations period began to run on March 20, 1979. Consequently, the plaintiffs must allege and prove that the defendant took positive steps after the commission of the initial fraud to keep it concealed. *See Tomera v. Galt,* 511 F.2d 504, 510 (7th Cir.1975). This type of fraudulent concealment tolls the limitations period until the plaintiffs actually discover the fraud, which arguably was after March 20, 1979 and within the statutory period. *See, id.*

■ Although the plaintiffs argue that the doctrine of equitable tolling applies to their claims, they are obligated to properly plead the circumstances supporting the claim that the defendant concealed their cause of action. *See Hill v. Der,* 521 F.Supp. at 1387. Here the complaint merely states in conclusory fashion that the plaintiffs could not have known of the cause of action before March 20, 1982.[43] This is grossly inadequate to support the contention that Mercantile concealed the plaintiffs' cause of action. Failure to plead the essential facts supporting fraudulent concealment is fatal to plaintiffs' securities laws claims against Mercantile. *Cf., Kroungold v. Triester,* 407 F.Supp. 414, 419 (E.D.Pa.1975). Accordingly, if equitable tolling is to preserve their claims, the plaintiffs must amend their complaint to include

**43.** Complaint ¶ 14 at 4.

specific factual allegations of fraudulent concealment on the part of Mercantile.

As an additional point, although it is clear that equitable tolling applies to the 10b–5 claims, *see, e.g., Tomera v. Galt,* 511 F.2d 504, 509 (7th Cir.1975); *Hill v. Der,* 521 F.Supp. at 1387, it is by no means clear that it applies to the claims governed by the limitations period provided for in Section 13 of the 1933 Act. There is a split of authority on this issue, with the decided weight of case law against the application of equitable tolling under Section 13. *Compare SEC v. Seaboard Corp.,* 677 F.2d 1301, 1308 (9th Cir.1982) (no equitable tolling); *Engl v. Berg,* 511 F.Supp. 1146, 1150–1151 (E.D.Pa. 1981) (same); *Brick v. Dominion Mortgage & Realty Trust,* 442 F.Supp. at 289–291 (same), *with In re Home-Stake Production Co. Securities Litigation,* 76 F.R.D. 337, 344–45 (N.D.Okl.1975) (equitable tolling applies); *Dyer v. Eastern Trust and Banking Co.,* 336 F.Supp. 890, 901–902 (D.Maine 1971) (same). The Court will not decide this particular issue until it is clear that the plaintiffs have cognizable claims governed by Section 13, and the parties have fully briefed the issue.

### B. *James Stritzinger*

Equitable has also argued that Stritzinger's securities law claims in connection with Eagle are barred under the applicable statute of limitations. The Court concludes that such claims are not barred.

#### (i) *Section 10b and Rule 10b–5 Claims.*

■ Stritzinger is a resident of Delaware. Consequently, Delaware limitations law will govern the 10b–5 claims against Equitable. *Ernst & Ernst v. Hochfelder,* 425 U.S. at 210 n. 29, 96 S.Ct. at 1389 n. 29. For the same reasons set forth for the 10b–5 claims of John T. Hill and Descomp, Inc., Stritzinger's 10b–5 claim against Equi-

table is governed by the three year limitations period of 10 *Del.C.* § 8106.[44]

It appears from the Complaint that Stritzinger paid additional monies towards his Eagle investment on June 1, 1979.[45] Following the "investment decision" analysis discussed previously,[46] the Court finds that this is the date Stritzinger's 10b–5 cause of action arose for purposes of this motion. This date is subject to revision upon the full development of a factual record. Consequently, because this action was filed before June 1, 1982, Stritzinger's 10b–5 claim is not time barred.

### (ii) Claims Under Sections 15 and 17 Of The 1933 Act and Sections 15 And 20(a) Of The 1934 Act.

In Count V, Stritzinger also alleges that Equitable violated Sections 15 and 17 of the 1933 Act and Sections 15 and 20(a) of the 1934 Act. For reasons more fully explained below, the claims based upon Section 17 of the 1933 Act and *Section 15 of the 1934 Act* will be dismissed on other grounds. Therefore, the only issue is to determine which statute of limitations governs the claims based upon *Section 15 of the 1933 Act* and Section 20(a) of the 1934 Act.

For the same reasons stated earlier, the Court holds that Section 13 of the 1933 Act is the applicable statute of limitations for Stritzinger's Section 15 claim.[47] The Complaint must be amended, however, to conform to the requirements of Section 13.[48]

■ It is not possible for the Court to determine what limitations period governs Stritzinger's 20(a) claim. As previously stated, Section 20(a) provides for controlling person liability in reference to any violation of the 1934 Act or a rule or regulation promulgated thereunder. 15 U.S.C.

§ 78t. The limitations period for the 20(a) claim will be the same as the limitations period that would govern the claim against the controlled person. *See Herm v. Stafford,* 663 F.2d at 679. Consequently, until Stritzinger amends his complaint to set forth which persons or entities Equitable controlled and which sections of the securities laws such persons violated, the Court cannot determine what statute of limitations governs his Section 20(a) claim.

Furthermore, for the same reasons previously set forth, the Court is unable to determine when Stritzinger's claims based upon Sections 15 and 20(a) accrued.[49] Consequently, the Court must reserve judgment on whether Stritzinger's claims under these sections are barred by the applicable limitations period.

### THE MERITS OF THE PLAINTIFFS' CLAIMS

At this juncture, the Court will discuss the merits of the securities laws claims as they pertain to both Wilmington House and Eagle. The defendant banks argue that the plaintiffs have failed to state any cause of action under the securities laws, and hence the Complaint should be dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

■ First, both Count I and Count V of the Complaint are based, in part, on Section 17(a) of the 1933 Act. However, this Court in *Hill v. Der,* a case involving the same plaintiffs and the same securities that are involved in this case, held that Section 17(a) does not give rise to a private right of action for damages. 521 F.Supp. at 1378. The Court will adhere to this prior decision. Therefore, the plaintiffs' claims based upon Section 17(a) of the 1933 Act will be dismissed.

■ Second, both Count I and Count V are based, in part, upon Sections 15(b) and

---

**44.** *See* pp. 1337–1339, *supra.*

**45.** Complaint ¶ 74 at 20.

**46.** *See* p. 1339, *supra.*

**47.** *See* p. 1341, *supra.*

**48.** *See* footnote 33, *supra* at 1341; pp. 1339–1340, *supra.*

**49.** *See* p. 1341.

15(c) of the 1934 Act (15 U.S.C. § 78*o* (b)(c)). These two sections deal exclusively with the regulation of brokers and dealers. Under Sections 3(a)(4) and (5) of the 1934 Act, however, a bank is not a broker or dealer. 15 U.S.C. §§ 78c(a)(4), (a)(5); *see also* 15 U.S.C. § 78c(a)(6). Once the defendants' status as a bank is demonstrated, the provisions of Sections 15(b) and 15(c) are not applicable. *Cf., Capital Funds, Inc. v. SEC,* 348 F.2d 582, 586–587 (8th Cir.1965). There is no question that both Mercantile and Equitable are banks within the meaning of the 1934 Act. Consequently, those claims based upon Sections 15(b) and 15(c) of the 1934 Act will be dismissed.

Third, both Count I and Count V seek punitive damages as a form of relief. This Court in *Hill v. Der* already has held that punitive or exemplary damages are not recoverable under the federal securities laws. 521 F.Supp. at 1390–1391. The Court will adhere to this prior decision. Accordingly, those portions of Counts I and V which seek punitive or exemplary damages will be dismissed.

Furthermore, as it stands now, the Complaint does not satisfy Fed.R.Civ.P. 9(b) which requires that claims pertaining to fraud must be stated with particularity. Indeed the Complaint does not, for the most part, satisfy the simple notice pleading requirements of Fed.R.Civ.P. 8. In short, the Complaint is virtually incomprehensible. If the plaintiffs' claims were predicated solely on what is currently before the Court, further relief for the defendants might be warranted at this time. There is very little presently in the Complaint upon which liability under the securities laws could be predicated. In their briefs, and at oral argument, however, the plaintiffs have proffered additional information that may impact upon their case.

Therefore, rather than dismissing the case, the Court will give the plaintiffs the opportunity to amend their Complaint. Inasmuch as the plaintiffs have informed the Court that they have substantial additional information that supports their claims, the plaintiffs will be permitted thirty (30) days for additional discovery to flesh out the specifics of their claims. At the end of this thirty day period, the plaintiffs shall file an Amended Complaint which satisfies Fed.R. Civ.P. 8, 9(b) and the other criteria set forth in this Opinion.

The Amended Complaint should set forth with particularity each alleged violation of the securities laws in a separate count. In addition, any claim based upon a conspiracy to violate the securities laws or upon a theory of aiding and abetting a primary violation of such laws should also be set forth with particularity in a separate count. If, after the filing of the Amended Complaint, the defendants wish to renew their motions to dismiss, they will be free to do so.

An Order will be entered in accordance with this Opinion.