John T. HILL, et al., Plaintiffs,

v.

EQUITABLE BANK, NATIONAL ASSOCIATION, Defendant.

Civ. A. No. 82–220 CMW.

United States District Court,
D. Delaware.

Aug. 16, 1984.

1064

Harvey S. Kronfeld, of Rawle & Henderson, Philadelphia, Pa., for plaintiffs.

Martin I. Lubaroff, of Richards, Layton & Finger, Wilmington, Del., for defendant; Michael D. Colglazier, and Edward F. Shea, III, of Miles & Stockbridge, Baltimore, Md.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

This case arises out of an alleged scheme to defraud plaintiffs in connection with the sale to plaintiffs of interests in two limited partnerships. In a related action, *Hill v. Der*, C.A. No. 80–146 (D.Del., filed April 1, 1980), plaintiffs have brought suit against various parties involved in these, and other, transactions. In this action, plaintiffs have brought suit against Equitable Bank, N.A.[1] (hereinafter "Equitable"), based upon the bank's alleged participation in the fraud.[2] Plaintiffs claim that Equitable has violated various anti-fraud provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934, as well as various duties under state law.

Presently before the Court is defendant's motion to dismiss. Defendant contends that: (a) plaintiffs' federal securities law claims are barred by applicable statutes of limitations; (b) plaintiffs' allegations, on their merits, fail to state a claim upon which relief may be granted under the federal securities laws; (c) plaintiffs have failed to plead their claims with the degree of particularity required by Fed.R.Civ.P. 9(b); and (d) plaintiffs' state law claims must be dismissed along with plaintiffs' federal securities law claims on grounds of lack of pendent jurisdiction.[3] As discussed herein, the Court grants defendant's motion in part.

## BACKGROUND

On November 11, 1977, plaintiffs John T. Hill, Thomas and Patricia Ruger, Virgil and Marie Scott, and Descomp, Inc., a corporation controlled and managed by Messrs. Ruger and Scott, entered into subscription agreements to purchase shares of Wilmington House Associates (hereinafter "Wilmington House"), a limited partnership formed for the purpose of acquiring and operating an apartment complex in Wilmington, Delaware. The sale of Wilmington House shares to plaintiffs was principally orchestrated by Lee P. Der. Through a wholly owned company, Lee P. Der, Inc., Der served as general partner of Wilmington House.

Plaintiffs paid for their Wilmington House shares by means of a down payment on November 11, 1977 and subsequent installment payments on May 1, 1978, Febru-

---

**1.** Equitable Bank, N.A. is the successor in interest to the Equitable Trust Co., the original named defendant in this action. Subsequent to the filing of this suit, The Equitable Trust Company became a national banking association.

**2.** Plaintiffs originally brought suit against Equitable and Mercantile Safe Deposit & Trust Co. (hereinafter "Mercantile"). However, plaintiffs subsequently settled and dismissed their claims against Mercantile.

**3.** Defendant also contends that plaintiffs seek damages that are not allowable under the federal securities laws. However, at oral argument on the motion to dismiss, the Court ruled that it would defer consideration of the damages issues, without prejudice to defendant's right to raise the issues at a later point in this litigation when the claims as to liability are more clearly established.

ary 1, 1979, February 1, 1980, and February 1, 1981. The installment payments were financed through letters of credit issued by defendant Equitable.

On November 2, 1978, plaintiffs Thomas Ruger, Virgil and Marie Scott, and Data Controls North, Inc., a corporation controlled and managed by Ruger and Scott, entered into subscription agreements to purchase shares of another limited partnership, Eagle Associates (hereinafter "Eagle"). Plaintiff James Stritzinger entered into a similar subscription agreement on November 30, 1978. Eagle was formed as a resyndication of a predecessor limited partnership, Alma Coal Properties, Ltd. (hereinafter "Alma"), and engaged in the business of mining and selling coal, and leasing coal lands, in West Virginia. As with the sale of Wilmington House shares, the sale of Eagle shares to plaintiffs was principally orchestrated by Lee P. Der. Through Der-Mas, Inc., a corporation controlled by Der, Der served as general partner of Eagle.

James Stritzinger paid for Eagle shares by means of a down payment on December 18, 1978 and subsequent installment payment on June 1, 1979, and June 1, 1980. Stritzinger financed his down payment with a loan from Equitable and financed his installment payments with letters of credit issued by Equitable.

Thomas Ruger, Virgil and Marie Scott, and Data Controls North, Inc. paid for their Eagle shares by means of a down payment on December 15, 1978 and subsequent installment payments on June 1, 1979 and June 1, 1980. Equitable declined to issue letters of credit to finance plaintiffs' installment payments.[4] As a result, between January and March of 1979, Thomas Ruger, Virgil and Marie Scott, and Data Controls North, Inc., issued loans to Eagle to secure payment of the balance due on the purchase price of their shares. These loans were then applied as a set-off against the balance due on the purchase price of the shares when the installment payments subsequently came due.[5]

Shortly after plaintiffs purchased shares of Wilmington House and Eagle, "storm warnings" began to appear, indicating that the investments were not as sound as they had first appeared. In January, 1979, Wilmington House's principal asset, Lancaster Court Associates, filed a petition for bankruptcy. In May, 1979, plaintiffs received their Wilmington House tax returns, revealing heavy operating losses by the partnership. Furthermore, in the latter months of 1979 and early months of 1980, Der informed plaintiffs that a declining demand for coal would require a restructuring of Eagle's operations and necessitate substantial, unanticipated capital outlays.

On April 1, 1980, plaintiffs filed suit against Der, the partnerships, and others involved in the sale of partnership interests to plaintiffs. *Hill v. Der*, C.A. No. 80–146

**4.** Original co-defendant Mercantile made loans to finance plaintiffs' down payments on their Eagle shares. However, after officers of the bank allegedly discovered improprieties in connection with the financing of the transactions, Mercantile rejected plaintiffs' applications for letters of credit to finance plaintiffs' installment payments on their shares.

**5.** Throughout this litigation there has been substantial confusion regarding when payments were made by plaintiffs on both their Wilmington House and Eagle shares. Plaintiffs' original complaint alleged that payments were made on the Wilmington House shares up to and including the February 1, 1980 installment payments. In addition, the complaint alleged that James Stritzinger made full payment for his Eagle shares by June 1, 1979 and that Thomas Ruger, Virgil and Marie Scott, and Data Controls

North, Inc. made full payment for their Eagle shares on an accelerated basis by March, 1979. However, plaintiffs amended complaint alleges that full payment was made on the Wilmington House shares and that all payments on both the Wilmington House and Eagle shares were made on the scheduled installment dates. At oral argument on the present motion to dismiss, plaintiffs' counsel explained that Thomas Ruger's, Virgil and Marie Scott's, and Data Controls North, Inc.'s January through March, 1979 "payments" on their Eagle shares were in fact loans issued to the partnership to secure their subsequent installment payments on their shares. For purposes of the motion to dismiss, the Court must accept plaintiffs' allegations as true and the Court may not pierce the purported loans to examine the substance of the transactions.

(D.Del., filed April 1, 1980). Plaintiffs allege, *inter alia*, that they were fraudulently induced to purchase shares of Wilmington House and Eagle through various misrepresentations concerning the soundness of the investments.

On February 20, 1981, James Stritzinger wrote a letter to the Maryland State Bank Commissioner inquiring about potential improprieties regarding Equitable's relationship with Der[6] and Equitable's financing of Stritzinger's purchase of Eagle shares. The Bank Commissioner forwarded Stritzinger's letter to Equitable with a request for an explanation. On March 9, 1981, John T. Hill wrote a letter to Equitable, and on March 13, 1981, Virgil Scott wrote a letter to Equitable, inquiring about similar improprieties in connection with Equitable's financing of plaintiffs' purchases of Wilmington Associates shares. They inquired further whether any employees had been terminated by Equitable as a result of such improprieties.[7]

On March 10, 1981, Equitable wrote a letter to the Bank Commissioner, denying any wrongdoing in connection with its financing of Stritzinger's purchases of Eagle shares, a copy of which was forwarded by the Bank Commissioner to Stritzinger on March 17, 1981. Similarly, on April 27, 1981, Equitable wrote letters to Hill and Scott, denying any improprieties in connection with its financing of plaintiffs' purchases of Wilmington House shares, copies of which were forwarded to the Bank Commissioner. The Bank Commissioner apparently took no further action on this matter.

On March 20, 1982, Thomas Ruger unexpectedly received a phone call from Martin E. Mason, a 40% shareholder of Der-Mas, Inc., a general partner of Eagle. Mason informed Ruger that Stephen Maszaros, a Vice President of Equitable, and other employees of the bank, had received kickbacks in return for arranging the financing for plaintiffs' purchases of Wilmington House shares.

On April 30, 1982, plaintiffs filed suit against Equitable based upon the alleged kickbacks. Plaintiffs claimed that Equitable violated the federal securities laws by failing to disclose the kickbacks and by otherwise aiding and abetting, and conspiring in, a scheme to defraud plaintiffs in connection with their purchases of Wilmington House and Eagle shares.

On September 15, 1982, Equitable filed a motion to dismiss on the grounds that plaintiffs' federal securities law claims are time-barred and fail to state valid claims under the securities law. In considering Equitable's motion, the Court found plaintiffs' claims to be conclusory, incomplete, and otherwise wholly inadequate under the specificity requirements of F.R.C.P. 9(b). Nevertheless, the Court found that plaintiffs' allegations raised sufficient questions of fact to prevent the Court from ruling upon Equitable's statute of limitations defense as a matter of law. Furthermore, in their briefs and at oral argument, plaintiffs set forth additional allegations to supplement the merits of their claims. Therefore, the Court denied Equitable's motion in substantial part. The Court granted plaintiffs leave to conduct additional discovery to flesh out their claims and ordered plaintiffs to file an amended complaint setting forth their claims with specificity and detail. When the amended complaint was filed, Equitable would be permitted to renew its motion to dismiss. *Hill v. Equitable Trust Co.*, 562 F.Supp. 1324 (D.Del.1983).

On October 7, 1983, plaintiffs filed an amended complaint. The Wilmington House claims set forth in the amended complaint are substantially similar to those set forth in the original complaint. Plaintiffs' claims are primarily grounded in the alleged kickbacks received by employees of

---

6. Apparently, plaintiffs' applications for loans and letters of credit to finance their purchases of Wilmington House and Eagle shares were handled through Der and F & S Financial, Inc., a broker-dealer controlled by Der.

7. In February, 1981, Virgil Scott and Thomas Ruger apparently learned that a bank employee involved in arranging letters of credit for plaintiffs' purchases of Wilmington House shares had left the bank in mid-1978.

Equitable in return for arranging the financing for plaintiffs' purchases of Wilmington House shares. Plaintiffs claim that Equitable violated the federal securities laws by failing to disclose the kickbacks to plaintiffs and by otherwise aiding and abetting and conspiring with Der and others in a scheme to defraud plaintiffs in connection with their purchases of Wilmington House shares.

Plaintiffs have also set forth an additional allegation against Equitable not alleged in their original complaint, pertaining to their purchases of Wilmington House shares.[8] On November 6, 1978, Der set up a meeting with some of the plaintiffs to discuss, *inter alia,* financing for plaintiffs' purchases of Eagle shares. Plaintiffs allege that at the meeting, R. Kenneth Rous, a Vice President of Equitable, made certain misrepresentations concerning Eagle, including the misrepresentation that Eagle was a sound investment. Plaintiffs claim that this misrepresentation constituted an implicit misrepresentation that Der and other principals behind Eagle were honest and law-abiding, which in turn constituted an implicit misrepresentation that the same principals behind Wilmington House were honest and law abiding.

The Eagle claims set forth in the amended complaint differ substantially from those set forth in the original complaint. The Eagle claims in the original complaint

related to Equitable's failure to disclose the alleged kickbacks received by employees of Equitable in connection with Equitable's financing of plaintiffs' purchases of Wilmington House shares.[9] In contrast, the Eagle claims in the amended complaint primarily relate to an alleged fraudulent scheme underlying the resyndication of the Eagle partnership and the sale of partnership shares to plaintiffs.

Apparently, in August of 1978, Ward Development Co. (hereinafter "Ward"), the sole limited partner of Alma, the predecessor of the Eagle partnership, brought suit against Der, the partnership and others, claiming various breaches of the partnership agreement. On August 31, 1978, Ward obtained a temporary injunction prohibiting Equitable from making payments on letters of credit issued to Ward to finance its purchases of Alma shares. Plaintiffs' contend that Ward's lawsuit and the possibility of Ward's withdrawal from Alma threatened to financially cripple the partnership and created a substantial risk that Alma would default on loans by Equitable to the partnership. Plaintiffs allege that Equitable, therefore, entered into a fraudulent scheme with Der and others to conceal the lawsuit and resyndicate Alma as Eagle, issuing shares of the new partnership to plaintiffs in order to financially

---

**8.** Plaintiffs claim to have set forth this allegation in their amended complaint. However, while the amended complaint can be liberally construed to incorporate the allegation, it was explicitly set forth by plaintiffs for the first time in their brief in opposition to Equitable's renewed motion to dismiss.

**9.** In the original complaint, only James Stritzinger asserted claims against Equitable, alleging primary liability under the federal securities laws for fraud in connection with the sale of Eagle shares. This was apparently due to the fact that only Stritzinger received financing from Equitable for the purchase of Eagle shares. Evidently, the legal theory underlying plaintiffs' original complaint was that Equitable owed a duty under the federal securities laws to disclose material information to plaintiffs in connection with their purchases of Wilmington House and Eagle shares, based upon its role in financing the transactions. Other purchasers of

Eagle shares, Thomas Ruger, Virgil and Marie Scott, and Data Controls North, Inc. asserted claims against original co-defendant Mercantile, alleging primary liability under the federal securities laws for fraud in connection with their purchases of the partnership shares. These plaintiffs claimed that employees of Mercantile received kickbacks from Der or others in return for arranging the financing for plaintiffs' purchases of Eagle shares, but that Mercantile rejected plaintiffs' applications for letters of credit when the bank discovered the improprieties, yet the bank fraudulently failed to disclose the kickbacks to plaintiffs. It must be noted, however, that all purchasers of Eagle shares asserted claims against Equitable in the original complaint for secondary liability under the federal securities laws, alleging that Equitable aided and abetted and conspired with Mercantile, Der, and others in a scheme to defraud plaintiffs in connection with their purchases of Eagle shares.

"bail out" the partnership and bail out Equitable's loans to the partnership.

Plaintiffs allege that pursuant to this scheme, Equitable's Vice President, R. Kenneth Rous, made certain misrepresentations at the November 6, 1978 meeting, discussed above. Specifically, plaintiffs allege that Rous misrepresented that Eagle was a sound investment, that Equitable had no self-interest in the sale of partnership shares to plaintiffs, that Equitable expected to make substantial equipment loans to the partnership, and that Eagle's Private Placement Memorandum was accurate when, in fact, the Memorandum simply stated that "Alma's sole limited partner . . . decided to withdraw from the operational side of the coal business."

Plaintiffs claim that Equitable committed fraud under the federal securities laws by making the aforementioned misrepresentations at the November 6, 1978 meeting. In addition, plaintiffs claim that Equitable is liable under the federal securities laws as an aider and abettor or conspirator in the alleged fraudulent bail out scheme. Finally, plaintiffs claim that Equitable is liable under federal securities laws as a controlling person behind the bail-out scheme, due to the financial leverage it possessed over the Alma/Eagle partnership as a result of its substantial outstanding loans to the partnership.

On November 7, 1983, Equitable renewed its motion to dismiss. It is this motion that is presently before the Court.

STATUTE OF LIMITATIONS

1. *Relation Back of Amended Complaint*

A threshold issue raised by Equitable's statute of limitations defense is whether the filing of plaintiffs' amended complaint relates back to the filing of plaintiffs' original complaint for purposes of determining the timeliness of plaintiffs' claims. Equitable does not dispute that the Wilmington House claims in the amended complaint relate back to the Wilmington House claims in the original complaint. Nor does

Equitable dispute that James Stritzinger's Eagle claims in the amended complaint relate back to Stritzinger's Eagle claims in the original complaint. However, Equitable does contend that the Eagle claims of Thomas Ruger, Virgil and Marie Scott, and Data Controls North, Inc. in the amended complaint do not relate back to the original complaint.

■ Fed.R.Civ.P. 15(c) provides in relevant part that "[w]henever the claim or defense asserted in the amended pleading arose out of the *conduct, transaction, or occurrence* set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading." (emphasis added). The most important factor in determining whether the filing of an amended pleading relates back to the filing of a prior pleading is whether the prior pleading gave the opposing party adequate notice of the "conduct, transaction or occurrence" out of which the claims or defenses asserted in the amended pleading arise. 3 J. Moore, *Moores' Federal Practice* ¶ 15.15[3] at 15–194 (2d ed. 1984).

Equitable's contention that the Eagle claims of Thomas Ruger, Virgil and Marie Scott, and Data Controls North, Inc. in the amended complaint do not relate back to the original complaint is based upon the fact that, in the original complaint, only James Stritzinger asserted claims against Equitable alleging primary liability for fraud in connection with the sale of Eagle shares.[10] However, Ruger, the Scotts, and Data Controls North, Inc. did assert claims against Equitable in the original complaint for secondary liability under the federal securities laws, alleging that Equitable aided and abetted and conspired with Der and others in a scheme to defraud plaintiffs in connection with their purchases of Eagle shares.

■ Equitable, therefore, was given adequate notice in the original complaint of the "conduct, transaction, or occurrence" underlying the Eagle claims asserted by Rug-

---

**10.** *See* Footnote 9, *supra.*

er, the Scotts, and Data Controls North, Inc. in the amended complaint. As one court has stated, "[w]hen a suit is filed in a federal court under the Rules, the defendant knows that the whole transaction described in it will be fully sifted, by amendment if need be, and that the form of the action or the relief prayed or the law relied on will not be confined to their first statement." *Barthel v. Stamm*, 145 F.2d 487, 491 (5th Cir.1944), *cert. denied*, 324 U.S. 878, 65 S.Ct. 1026, 89 L.Ed. 1430 (1945). Consequently, the Court finds that the Eagle claims set forth by Ruger, the Scotts, and Data Controls North, Inc. in the amended complaint relate back to the original complaint for purposes of determining the timeliness of the claims.

### 2. *Rule 10b–5 Claims*

■ Plaintiff's claims under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder are implied causes of action; the federal securities laws do not expressly provide civil remedies for violations of Section 10(b) of the Exchange Act and Rule 10b–5. Consequently, the federal securities laws do not provide a statute of limitations that governs the timeliness of 10b–5 claims. In the absence of an applicable federal limitations period, courts have measured the timeliness of 10b–5 claims by reference to state law; that is, courts have measured the timeliness of 10b–5 claims by applying state law limitations periods that govern closely analogous state law causes of action. *See Hill v. Der*, 521 F.Supp. 1370, 1379–83 (D.Del.1981).

In applying this analysis to the facts in this case, the Court has previously determined that the 10b–5 claims of John T. Hill, James Stritzinger, and Descomp, Inc. are governed by the three year limitations period set forth in 10 *Del.C.* § 8106. *Hill v. Equitable Trust Co.*, 562 F.Supp. at 1337–39. In addition, the Court has determined in part, and the parties have otherwise concurred, that the 10b–5 claims of Thomas and Patricia Ruger, Virgil and Marie Scott, and Data Controls North, Inc. are governed

by the one year limitations period set forth in Md. Corps. & Ass'n. Code Ann. § 11–703(f). *Id.* at 1336.

■ Although a court must look to state law to determine the limitations period that is applicable to a 10b–5 claim, federal law determines when a 10b–5 cause of action accrues and when the limitations period begins to run on the claim. *Hill v. Der*, 521 F.Supp. at 1387. The parties agree that a 10b–5 cause of action accrues on the date that the purchase or sale of securities in question occurred. The parties, however, disagree as to when the purchases of securities occurred in this case. Equitable contends that plaintiffs purchased their shares of Wilmington House and Eagle on the dates that plaintiffs entered into their subscription agreement. Plaintiffs, on the other hand, contend that each installment payment on the purchase price of their shares constituted separate purchases of partnership interests.

■ In general, under the federal securities laws, a purchase or sale of securities occurs on the date that a party enters into a binding commitment to undertake a securities transaction, even though full performance of the transaction does not occur until a later date. *See Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 890–91 (2d Cir.1972). Conversely, however, if a party enters into an agreement to undertake a securities transaction but, prior to full performance of the transaction, the party possesses the power to terminate it, the party may be viewed as making an investment decision at each point the party possesses the power to terminate the transaction but chooses to go forward. Each such investment decision may be viewed as a purchase or sale of securities separate and apart from the initial agreement to undertake the transaction. *See, e.g., Goodman v. Epstein*, 582 F.2d 388, 409–414 (7th Cir.1978), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979); *Ingenito v. Bermec Corp.*, 376 F.Supp. 1154, 1183–84 (S.D.N.Y.1974).

Equitable contends that the "investment decision" doctrine is inapplicable to the

facts in this case. Equitable argues that plaintiffs' subscription agreements constituted binding commitments to purchase shares of Wilmington House and Eagle and that the installment payments on the shares simply constituted a fulfillment of plaintiffs' obligations under the subscription agreements. In support of its position, Equitable notes that plaintiffs' installment payments on their Wilmington House shares, and James Stritzinger's installment payments on his Eagle shares, were financed through irrevocable letters of credit. Moreover, Thomas Ruger's, Virgil and Marie Scott's, and Data Controls North, Inc.'s installment payments on their Eagle shares were secured by purported loans to the partnership.

Plaintiffs, however, contend that, after entering into the subscription agreements, they still possessed the means by which to terminate their payment obligations on their shares. Of principal significance were plaintiffs' rights under the partnership agreements.[11] Apparently, under the partnership agreements, plaintiffs possessed the rights as limited partners to amend the agreements or dissolve the partnerships. Plaintiffs contend that these rights gave rise to investment options and that plaintiffs made investment decisions each time they chose to go forward with their payments rather than exercising these options.

Whether plaintiffs' rights under the partnership agreements gave rise to investment options that are cognizable under the

---

**11.** Plaintiffs have alleged other options that they could have exercised to terminate or otherwise avoid their payment obligations on their shares. Plaintiffs allege that they could have sold their shares; alternatively, they could have rescinded their purchases on grounds of fraud. These options, however, cannot provide the basis for a claim under the investment decision doctrine.

The investment decision doctrine applies only to options that allow a party to avoid going forward with a purchase (or sale) of securities. *See, e.g., Stephenson v. Calpine Conifers II, Ltd.,* 652 F.2d 808, 812–13 (9th Cir.1981); *Issen v. GSC Enterprises, Inc.,* 508 F.Supp. 1278, 1286–87 (N.D.Ill.1981); *Ingenito v. Bermec Corp.,* 376 F.Supp. at 1182–83. A sale of shares by plaintiffs would not have terminated their purchase obligations. To the contrary, plaintiffs' option to sell their shares necessarily presumes that plaintiffs had purchased the shares and possessed the ownership rights to sell the shares. At most, a sale of shares would have resulted in an assignment of plaintiffs' payment obligations, not a termination of such obligations. Although plaintiffs' right to sell their shares constituted an investment option, it was an option that existed separately from plaintiffs' purchase of their shares. Plaintiffs' foregone opportunities to sell their shares cannot, in themselves, provide a basis for a cause of action under 10b–5; for such foregone investment opportunities fail to satisfy the "purchaser/seller" requirement of stating a cause of action under 10b–5. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

Plaintiffs' rescission of their purchases on grounds of fraud certainly would have terminated their purchase obligations. Nevertheless, plaintiffs would have possessed the right to ter-

minate their purchases even if they had paid for their shares in full at the time of entering into the subscription agreements. If plaintiffs had paid for their shares in a lump-sum at the time of entering into the subscription agreements, any right that they might have had to subsequently rescind the purchases on grounds of fraud certainly would not have constituted an investment option under the investment decision doctrine. *See Ingenito v. Bermec Corp.,* 376 F.Supp. at 1176–77. A different result is not compelled simply by the fact that plaintiffs paid for their shares by means of fixed installment payments. *See Freschi v. Grand Coal Venture,* 551 F.Supp. 1220, 1229 n. 9 (S.D.N.Y.1982). If a party enters into an otherwise legally binding commitment to purchase securities, the applicability of the investment decision doctrine should not arbitrarily turn upon how purchase payments are structured under the transaction.

The Court recognizes that the investment options alleged by plaintiffs in this case are substantially similar to those alleged by the plaintiffs in *Goodman v. Epstein,* 582 F.2d at 397–98, 409–14. In *Goodman,* the Seventh Circuit held that whether the investment decision doctrine was applicable to the facts in the case was a question to be decided by the jury. *Id.* at 413. This Court relied upon the decision in *Goodman* in making a similar ruling on defendants' motion to dismiss in *Hill v. Der,* 521 F.Supp. at 1386–87, a decision which in turn was followed by the Court in this case in ruling upon Equitable's original motion to dismiss. *Hill v. Equitable Trust Co.,* 562 F.Supp. at 1339. Nevertheless, to the extent that the Seventh Circuit, in *Goodman,* adopted a broader view of the scope of the investment decision doctrine than that which is now adopted by the Court in this case, the Court declines to follow the *Goodman* decision.

investment decision doctrine depends upon how one views the relationship between plaintiffs' purchase obligations under the subscription agreements and plaintiffs' potential powers to alter these obligations through the exercise of rights under the partnership agreements. For example, it is possible to view plaintiffs' purchase obligations under the subscription agreements as binding commitments that were separate and distinct from plaintiffs' rights under the partnership agreements. Under such a view, plaintiffs purchased their shares at the time of entering into the subscription agreements and simply financed the purchases through installment payments. Consequently, under this view, any rights that plaintiffs possessed under the partnership agreements to alter their investments would not have given rise to investment options that are cognizable under the investment decision doctrine because the investment options available to plaintiffs simply constituted post-purchase opportunities to alter their investments. Moreover, these foregone investment opportunities would not otherwise provide a basis for a cause of action under 10b–5 because they would fail to satisfy the "purchaser/seller" requirment for stating a claim under 10b–5. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

It is, however, also possible to view plaintiffs' purchase obligations under the subscription agreements as conditional commitments, qualified by plaintiffs' option to terminate or otherwise modify these obligations through the exercise of rights under the partnership agreements. Under such a view, each payment made by plaintiffs on their shares constituted a separate purchase of partnership interests since, at the time of each payment, plaintiffs exercised their discretion to forego their option to terminate their payment obligations; consequently, plaintiffs' rights under the partnership agreements would have given rise to investment options that are cognizable under the investment decision doctrine. *See Goodman v. Epstein*, 582 F.2d at 412–13.

█ Whether plaintiffs state a claim under the investment decision doctrine is, therefore, a factual issue that may not be determined by the Court on the present motion to dismiss. Assuming the truth of plaintiffs' allegations and drawing all reasonable inferences from such allegations in a light most favorable to plaintiffs' claim, each payment on plaintiffs' shares constituted separate purchases of securities under the investment decision doctrine.

█ Nevertheless, plaintiffs may not invoke the investment decision doctrine with respect to payments made on their shares after April 1, 1980, when plaintiffs filed suit in *Hill v. Der*. In order to state a claim under the investment decision doctrine, plaintiffs must establish not only that they possessed options to avoid their payments, but also that they would have exercised these options if fraud had not occurred or if they had discovered the fraud. By the time that plaintiffs filed suit in *Hill v. Der*, plaintiffs certainly believed or strongly suspected that they had been defrauded by Der and others in connection with their purchases of Wilmington House and Eagle shares. Yet, after filing suit, plaintiffs did not exercise any rights under the partnership agreements, or take any other action, to prevent the execution of the final payments on their shares.[12] Rather, plaintiffs chose to file suit for fraud.[13]

---

**12.** At oral argument on the motion to dismiss, plaintiffs indicated that they did not have firm evidence of fraud in connection with their purchases of Eagle shares at the time they filed suit in *Hill v. Der;* rather, they merely suspected fraud. Nevertheless, if these suspicions were ripe enough for plaintiffs to file a lawsuit based upon the suspicions, then they were certainly ripe enough for plaintiffs to exercise investment options allegedly available to them to avoid their payment obligations on their shares.

**13.** At oral argument, plaintiffs indicated that the reason why they did not take any actions to prevent execution of the final payments on their shares was that they did not have the resources to both pursue litigation in *Hill v. Der* and bring a state court action in the State of Maryland to enjoin Equitable from honoring the letters of

Admittedly, plaintiffs' notice of fraud on the part of Der and others did not necessarily translate into notice of fraud on the part of Equitable. On this point, plaintiffs allege that, at the time they filed suit in *Hill v. Der*, they had no reason to suspect that Equitable had engaged in fraud in connection with their purchases of partnership shares. Nevertheless, it seems inconceivable that, if plaintiffs had been aware of fraud on the part of Equitable, they would have exercised options to avoid their payment obligations that they did not exercise despite notice of fraud on the part of Der and others. By plaintiffs' own allegations, Der was at the center of the alleged scheme to defraud plaintiffs. Certainly, any rights that plaintiffs could have exercised under the partnership agreements to terminate their payment obligations would have been directed against Der, not Equitable.

Plaintiffs, therefore, may not assert the investment decision doctrine with respect to payments made on their shares after the filing of *Hill v. Der*, on April 1, 1980.[14] Assuming the applicability of the investment decision doctrine to plaintiffs' earlier payments on their shares, plaintiffs' 10b–5 cause of action accrued on the dates

of the last such payments.[15] Plaintiffs' Wilmington House claims accrued on February 1, 1980 and plaintiffs' Eagle claims accrued on June 1, 1979.

The limitations periods applicable to plaintiffs' 10b–5 claims did not necessarily begin to run on the date on which the causes of action accrued. Under the federal doctrine of "equitable tolling", the statute of limitations does not begin to run on a cause of action for fraud if the plaintiff "remains in ignorance of [the fraud] without any fault or lack of diligence on his part." *Holmberg v. Armbrecht*, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946). However, once a plaintiff becomes aware, or should have been aware, of sufficient "storm warnings" of fraud to place the plaintiff on "inquiry notice", the plaintiff must exercise reasonable diligence in investigating the cause of action for fraud. *See, e.g., Buder v. Merrill Lynch, Pierce, Fenner & Smith*, 644 F.2d 690, 692–93 (8th Cir.1981); *Cook v. Avien, Inc.*, 573 F.2d 685, 696 (1st Cir.1978). The statute of limitations begins to run once the plaintiff is aware of, or should have been aware of, enough facts pointing to fraud that the possibility of fraud is, or should have been,

credit issued to finance plaintiffs' payments on their Wilmington House shares and James Stritzinger's payments on his Eagle shares. However, this explanation does not answer why Thomas Ruger, Virgil and Marie Scott, and Data Controls Norht, Inc, did not take any actions to prevent Eagle's general partners from applying their loans to the partnership as a set-off against the payments due on their shares. More importantly, plaintiffs have failed to explain why they did not exercise any of their alleged options under the partnership agreements to terminate their payment obligations. As discussed above, plaintiffs' right to bring suit to rescind their payment obligations on grounds of fraud does not constitute an investment option cognizable under the investment decision doctrine. In the final analysis, it is not important why plaintiffs failed to exercise any investment options available to them to avoid their payments on their shares. Rather, under the investment decision doctrine, it is only important that, with notice of fraud, plaintiffs failed to exercise any such options.

14. The investment decision doctrine can be a double edged sword. Assuming that plaintiffs

possessed investment options at the time that payments were made on their shares, it is doubtful whether plaintiffs can recover damages with respect to payments made on their shares after the filing of *Hill v. Der*. Moreover, under 10b–5's "due diligence" standard, plaintiffs might also be barred from recovering damages with respect to earlier payments on their shares if plaintiffs, in the exercise of due diligence, should have discovered fraud prior to the payments. *See, e.g., Straub v. Vaisman & Co., Inc.*, 540 F.2d 591, 596–98 (3d Cir.1976); *McLean v. Alexander*, 420 F.Supp. 1057, 1077–78 (D.Del.1976), *rev'd on other grounds*, 599 F.2d 1190 (3d Cir.1979).

15. The parties apparently agree that, assuming the applicability of the investment decision doctrine, plaintiffs' payments for their shares are to be considered integrated purchases of securities. As such, plaintiffs' 10b–5 cause of action accrued on the dates that the last payments were made on the shares, rather than on the dates of each separate payment.

apparent.[16] *Cf., Hill v. Der*, 521 F.Supp. at 1388 (applying the reasonable diligence standard under § 13 of the Securities Act of 1933); *Ingenito v. Bermec*, 441 F.Supp. 525, 554 (S.D.N.Y.1977) (same).

Plaintiffs contend that they had no reason to believe that Equitable had committed fraud in connection with their purchase of partnership shares until March of 1982, when plaintiffs learned that employees of Equitable had received kickbacks in connection with the Wilmington House letters of credit. Plaintiffs acknowledge that storm warnings began to appear in 1979, such as the bankruptcy of Wilmington House's principal asset, Lancaster Court Associates, revealing that their investments were not as sound as they had been led to believe.[17] Nevertheless, plaintiffs argue that these storm warnings, at most, placed them on inquiry notice of fraud on the part of Der and other principals behind the partnerships; at the time, Equitable appeared to be simply a bank involved in the financing of their purchase of partnership shares. Furthermore, plaintiffs contend that, although in February and March of 1981, they wrote letters to Equitable and the Maryland State Bank Commissioner inquiring about improprieties regarding Equitable's relationship with Der and Equitable's financing of their purchases, any suspicions that they had of wrongdoing on the part of Equitable were laid to rest by Equitable's letters denying any improprieties and the Bank Commissioner's failure to take further action on the matter.

Plaintiffs' assertions regarding their lack of notice of fraud on the part of Equitable are belied by plaintiffs' own allegations against Equitable. Plaintiffs allege that at a November 6, 1978 meeting set up by Der to discuss the financing for plaintiffs' purchases of Eagle shares, Equitable's Vice President, R. Kenneth Rous, made various misrepresentations to plaintiffs concerning the Eagle partnership, including the misrepresentation that Eagle was a sound investment. Moreover, plaintiffs allege that they interpreted and relied upon this representation as an implicit assurance that the Wilmington House partnership was a sound investment, given that Der was the central principal behind both partnerships. In light of these alleged misrepresentations, it would seem that plaintiffs were placed on inquiry notice of fraud on the part of Equitable, if not in 1979 when

**16.** In applying the doctrine of equitable tolling, some courts have distinguished between cases where defendants have committed fraud and subsequently attempted to conceal the fraud, and cases where defendants have simply committed fraud without undertaking subsequent acts to conceal the fraud. These courts have held that, in instances where fraud is compounded by active concealment, the statute of limitations does not begin to run until a plaintiff actually discovers the fraud. *See, e.g., Robertson v. Seidman & Seidman*, 609 F.2d 583, 593 (2d Cir.1979); *Tomera v. Galt*, 511 F.2d 504, 510 (7th Cir.1975). This Court cited this rule in its Opinion on Equitable's and original co-defendant Mercantile's previous motions to dismiss. *Hill v. Equitable Trust Co.*, 562 F.Supp. at 1344. However, upon further consideration, the Court has determined that a defendant's active concealment of fraud should not relieve a plaintiff of his duty to exercise reasonable diligence in discovering the fraud. Rather, a defendant's acts of concealment should only be a factor in determining when a plaintiff, in the exercise of reasonable diligence, should have discovered fraud. A growing number of courts have adopted such a rule. *See, e.g., Campbell v. Upjohn Co.*, 676 F.2d 1122, 1128 (6th Cir.1982);

*Ohio v. Peterson, Lowry, Rall, Barber & Ross*, 651 F.2d 687, 694–95 (10th Cir.), *cert. denied*, 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 309 (1981); *In re Beef Industry Antitrust Litigation*, 600 F.2d 1148, 1169–70 (5th Cir.1979), *cert. denied*, 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980).

**17.** Plaintiffs contend that the 1979 storm warnings related principally to the Wilmington House partnership. Plaintiffs allege that they did not become aware of the severe financial deterioration of the Eagle partnership until the summer of 1981, when Martin E. Mason informed them of Eagle's financial problems. Nevertheless, at oral argument on the present motion to dismiss, plaintiffs indicated that in the latter part of 1979 and early part of 1980, Der had informed plaintiffs that a declining demand for coal would require a restructuring of Eagle's operations and necessitate substantial, unanticipated capital outlays. Apparently, this disclosure sufficiently raised plaintiffs' suspicions of fraud for plaintiffs to file claims of fraudulent misrepresentation in connection with their purchase of Eagle shares in *Hill v. Der*.

storm warnings of fraud began to appear, then at least by April 1, 1980, when plaintiffs filed suit in *Hill v. Der*. By the time that plaintiffs filed suit in *Hill v. Der*, plaintiffs believed or strongly suspected that they had been fraudulently induced into purchasing Wilmington House and Eagle shares through various misrepresentations by Der and others concerning the soundness of the investments. Although, given Equitable's collateral role in plaintiffs' purchases, plaintiffs might not have possessed firm grounds for believing that any similar misrepresentations by Equitable were anything more than innocent, unknowing misrepresentations, it would seem that plaintiffs, by this time, should have suspected the possibility of fraud on the part of Equitable. *See, e.g., Cahill v. Ernst & Ernst*, 448 F.Supp. 84, 86 (E.D. Wis.1978); *Ingenito v. Bermec Corp.*, 441 F.Supp. at 554.

Despite such elements of inquiry notice, plaintiffs have set forth almost no allegations of diligent efforts undertaken prior to the commencement of this suit to investigate the possibility of fraud in connection with these and other alleged misrepresentations by Equitable. Plaintiffs' fraudulent misrepresentation claims were asserted for the first time in the amended complaint. Plaintiffs uncovered the basis for these claims primarily through discovery in this suit and *Hill v. Der*. Plaintiffs contend that their ability to uncover the basis for these claims prior to the commencement of this action was impeded by the suspension of discovery in *Hill v. Der* from mid-1980 to the end of 1981, during the Court's consideration of defendant's motion to dismiss. Nevertheless, to the extent that discovery was suspended in *Hill v. Der*, plaintiffs could have relied upon other means of investigating their potential claims against Equitable.

Plaintiffs have also set forth few allegations of diligent efforts to investigate other alleged acts of fraud by Equitable, such as those relating to the alleged kickbacks received by employees of Equitable in connection with the Wilmington House letters of credit. In fact, plaintiffs admit that

they learned of the kickbacks out of the blue, when Martin E. Mason phoned Thomas Ruger on his own initiative to disclose the kickbacks. In their letters to Equitable in March of 1981, John T. Hill and Virgil Scott inquired whether any employees had been terminated by the bank due to improprieties in connection with the Wilmington House letters of credit. However, plaintiffs undertook no further efforts to follow up on their suspicions of wrongdoing. Plaintiffs contend that they were lulled to sleep by Equitable's denial of improprieties. However, it is questionable whether plaintiffs fulfilled their duties of reasonable diligence by simply relying upon Equitable's denial of wrongdoing and failing to undertake further investigative efforts. *See Militsky v. Merrill Lynch, Pierce, Fenner & Smith*, 540 F.Supp. 783, 787 (N.D.Ohio 1980).

■ Based upon the pleadings, there is very little evidence to indicate that plaintiffs exercised reasonable diligence in investigating their potential claims against Equitable. However, the picture in this case is somewhat clouded by Equitable's collateral role in plaintiffs' purchases of shares and Equitable's denial of improprieties in response to plaintiffs' inquiries. The question of reasonable diligence under the doctrine of equitable tolling raises factual issues that rarely may be decided by a court as a matter of law. *See Kubik v. Goldfield*, 479 F.2d 472, 477 N. 12 (3rd Cir.1973) (applying the reasonable diligence standard under § 13 of the Securities Act of 1933). Admittedly, this case appears to stretch the limits of this principle. Nevertheless, the pleadings raise sufficient factual questions to preclude the Court from ruling that any of plaintiffs' 10b–5 claims are time-barred as a matter of law.

### 3. *Section 20(a) Claim*

As with plaintiffs' 10b–5 claims against Equitable, plaintiffs' claim under § 20(a) of the Securities Exchange Act of 1934 is not expressly governed by a statute of limitations set forth in the Act. Section 20(a) of

the Exchange Act establishes joint and several liability on the part of any person who directly or indirectly controls another person who violates a section of the Act or a rule promulgated thereunder. The Court has previously ruled that, since the liability of a controlling person under § 20(a) of the Exchange Act is joint and several with the liability of the controlled person, and is predicated upon the Exchange Act violations of the controlled person, a § 20(a) claim against a controlling person is governed by the same limitations period that is applicable to the Exchange Act claims against the controlled person. *Hill v. Equitable Trust Co.*, 562 F.Supp. at 1341.

■ Plaintiffs' § 20(a) claim against Equitable is predicated upon 10b–5 violations allegedly committed by Der and other Eagle principals in connection with plaintiffs' purchases of Eagle shares. In *Hill v. Der*, this Court has previously ruled that the limitations period applicable to plaintiffs' 10b–5 claims against these Eagle principals is the two year limitations period provided by 6 *Del.C.* § 7323(e). *Hill v. Der*, 521 F.Supp. at 1385. Consequently, plaintiffs' § 20(a) claim against Equitable is governed by the same two year limitations period.

Plaintiffs' § 20(a) cause of action accrued on the date or dates that plaintiffs' purchased their Eagle shares. The question of when plaintiffs purchased their shares turns upon whether the investment decision doctrine is applicable to the facts of the case. Nevertheless, as previously discussed, even assuming that plaintiffs' payments on their shares constituted separate purchases of securities under the investment decision doctrine, plaintiffs may not assert the doctrine with respect to payments made on their shares after the filing of *Hill v. Der*. Consequently, plaintiffs' § 20(a) cause of action accrued, at the latest, on June 1, 1979, the date of plaintiffs' last payment on their Eagle shares prior to the filing of *Hill v. Der*.

■ Plaintiffs' § 20(a) cause of action, therefore, accrued more than two years prior to the commencement of this suit.

Nevertheless, whether plaintiffs' § 20(a) claim is time-barred under the two year limitations period depends upon how the doctrine of equitable tolling applies to the facts in this case. As discussed previously, this factual issue may not be determined by the Court on the present motion to dismiss.

### 4. *Section 12(2) and Section 15 Claims*

Plaintiffs' claims under § 12(2) of the Securities Act of 1933 are governed by the statute of limitations set forth in § 13 of the Act. Section 13 of the Securities Act provides that a § 12(2) claim must be brought within one year of the date on which the § 12(2) violation was discovered or should have been discovered in the exercise of reasonable diligence; but that, in no event, may a § 12(2) claim be brought more than three years after the sale of securities at issue.

Plaintiffs' claim under § 15 of the Securities Act is also governed by the statute of limitations set forth in § 13 of the Act. Section 15 of the Securities Act establishes joint and several liability on the part of any person who directly or indirectly controls another person who violates certain provisions of the Act, including § 12(2). Claims brought under § 15 of the Securities Act are not expressly governed by the statute of limitations set forth in § 13 of the Act. Nevertheless, as is the case with respect to a § 20(a) claim under the Exchange Act, a § 15 claim against a controlling person is governed by the same limitations period that is applicable to the Securities Act claims against the controlled person. *Hill v. Equitable Trust Co.*, 562 F.Supp. at 1341. Here, plaintiffs' § 15 claim is predicated upon § 12(2) violations allegedly committed by Der and other Eagle principals in connection with plaintiffs' purchase of Eagle shares; violations which are governed by § 13 of the Securities Act.

■ Section 13 of the Securities Act establishes an absolute three year limitations period for bringing suit under § 12(2) of the Securities Act or, in this case, § 15 of the Securities Act as well. Although

there is some authority to the contrary, *see In re Home-Stake Production Co. Securities Litigation*, 76 F.R.D. 337, 344–45 (N.D.Okla.1975), most courts have held that § 13's three year limitations period is not affected by the doctrine of equitable tolling. *See, e.g., Admiralty Fund v. Hugh Johnson & Co.*, 677 F.2d 1301, 1308 (9th Cir.1982); *Summer v. Land & Leisure, Inc.*, 664 F.2d 965, 968 (5th Cir.1981), *cert. denied*, 458 U.S. 1106, 102 S.Ct. 3484, 73 L.Ed.2d 1367 (1982). The doctrine of equitable tolling is a federal common law doctrine that may be preempted by congressional mandate. Section 13 of the Securities Act clearly provides that, in no event, may a claim be brought under § 12(2) of the Act more than three years after the sale of securities in question.

■ Plaintiffs' § 12(2) and § 15 claims would, therefore, be barred by § 13's three year limitations period if plaintiffs purchased their Wilmington House and Eagle shares more than three years prior to the commencement of this suit. Whether plaintiffs' purchases fell within the three year limitations period turns upon whether plaintiffs' payments on their shares represented purchases of partnership interests under the investment decision doctrine.[18] As discussed previously, plaintiffs may not assert the investment decision doctrine with respect to payments made on their shares after the filing of *Hill v. Der*. Nevertheless, assuming that the investment decision doctrine is otherwise applicable to plaintiffs' payments on their shares, plaintiffs' last purchases of interests in the Wilmington House partnership occurred on February 1, 1980, and plaintiffs' last purchases of interests in the Eagle partnerships occurred on June 1, 1979. These purchases of partnership interests would fall within § 13's three year limitations period. Consequently, at this point in the proceedings, the Court cannot rule as a matter of law that plaintiffs' § 12(2) and § 15 claims are barred by § 13's three year limitations period.[19]

■ Plaintiffs' § 12(2) and § 15 claims would also be time-barred under § 13 of the Securities Act if plaintiffs brought suit more than one year after the date on which they should have discovered their causes of

---

**18.** Equitable contends that the investment decision doctrine is a limited doctrine that applies only to claims brought under § 10(b) of the Exchange Act and therefore, may not be relied upon by plaintiffs with respect to their § 12(2) and § 15 claims. Equitable argues that the investment decision doctrine is based upon a broad construction of the phrase "purchase of securities" and that, while § 10(b) of the Exchange Act broadly proscribes fraud in connection with the purchase or sale of securities, § 12(2) of the Securities Act only proscribes fraud in connection with the sale of securities. Consequently, although plaintiffs might have possessed investment options after entering into their subscription agreement, options which gave rise to investment decisions each time plaintiffs made payments on their shares, these investment decisions occurred after the partnership shares were sold to plaintiffs; for the sale of the shares occurred when plaintiffs entered into the subscription agreements.

If the Court were to embrace the exceedingly broad interpretation of the investment decision doctrine asserted by plaintiffs, Equitable's argument would have merit. Plaintiffs have set forth investment options, such as the option to sell their shares, which existed quite independently of the sale of shares to plaintiffs. How-

ever, as previously discussed, the Court believes that the scope of the investment decision doctrine is much narrower then is asserted by plaintiffs. *See* Footnote 11. Properly construed, the investment decision doctrine applies to options that allow a party to avoid going forward with a purchase (or sale) of securities, not options that allow a party to alter his investment after a purchase has occurred. Therefore, under the investment decision doctrine, a purchase of securities is simply a mirror image of a sale of securities. The investment decision doctrine is simply a principle by which to determine when a purchase or sale of securities has occurred. In applying the investment decision doctrine, courts have not limited its application solely to claims brought under § 10(b) of the Exchange Act. *See Ingenito v. Bermec Corp.*, 376 F.Supp. at 1183 n. 12; *Gross v. Independence Shares Corp.*, 36 F.Supp. 541 (E.D.Pa.1941).

**19.** As noted previously, *see* Footnote 15, the parties appear to agree that assuming the applicability of the investment decision doctrine, plaintiffs' payments for their shares are to be considered integrated purchases of securities. Consequently, plaintiffs would not be barred from asserting claims with respect to any of their payments if at least one payment fell within the limitations time period.

action in the exercise of reasonable diligence. However, for reasons previously discussed, the Court finds that plaintiffs' pleadings raise sufficient questions as to when plaintiffs should have discovered their causes of action in the exercise of due diligence to prevent the Court from ruling as a matter of law that plaintiffs' § 12(2) and § 15 claims are time-barred under § 13's one year limitations period.

## MERITS OF CLAIMS

### 1. *Primary Liability*

Plaintiffs have set forth two general types of fraud allegedly committed by Equitable, which purportedly state a claim of primary liability under 10b–5. First, plaintiffs allege that Equitable failed to disclose material information to plaintiffs concerning their investments in the Wilmington House and Eagle partnerships, which Equitable had an affirmative duty to disclose. For example, plaintiffs maintain that Equitable failed to disclose the kickbacks allegedly received by employees of the bank in connection with the Wilmington House letters of credit and that Equitable failed to disclose its financial conflicts of interests with respect to the sale of Eagle shares, as well as the alleged "bailout" purpose behind the resyndication of the partnership. Second, plaintiffs alleged that, at a November 6, 1978 meeting set up by Der to discuss the financing of plaintiffs' purchases of Eagle shares, R. Kenneth Rous, a Vice President of Equitable, made certain misrepresentations to plaintiffs concerning the Eagle partnership. Rous allegedly misrepresented that Eagle was a sound investment, that Equitable had no conflicts of interests in the sale of Eagle shares, that Equitable planned to make substantial equipment loans to the partnership, and that the Eagle private Placement Memorandum was accurate, when in fact the document contained false and misleading representations concerning the reasons behind the resyndication of the partnership. Furthermore, plaintiffs allege that they interpreted and relied upon Rous' representation concerning the soundness of the Eagle partnership as an implicit assurance that

the Wilmington House partnership was also a sound investment, to the extent that Der was the central principal behind both partnerships.

Equitable has challenged the merits of plaintiffs' claims on a number of grounds. Equitable notes that the fraudulent acts allegedly committed by Equitable in connection with plaintiffs' purchases of Wilmington House shares occurred after plaintiffs had entered into their subscription agreements. Similarly, most of the fraudulent acts allegedly committed by Equitable in connection with plaintiffs' purchases of Eagle shares occurred on November 6, 1978, after all plaintiffs, except James Stritzinger, had entered into their subscription agreements. Equitable argues that, consequently, Equitable's alleged acts of fraud lacked a causal nexus to plaintiffs' purchases of shares and therefore plaintiffs fail to state a claim under 10b–5 for fraud in connection with the purchase or sale of securities.

Equitable's argument is predicated on the assumption that plaintiffs' payments on their shares did not constitute purchases of securities under the investment decision doctrine. As discussed previously, whether this assumption is correct is a factual issue that may not be decided by the Court on the present motion to dismiss.

Equitable also contends that it did not owe plaintiffs an affirmative duty of disclosure under 10b–5. Equitable argues that any duties of disclosure that it owed to plaintiffs were simply those that arose from and related to Rous' alleged misrepresentations at the November 6, 1978 meeting.

■ The legal standard governing affirmative disclosure duties under 10b–5 was established by the Supreme Court in *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). In *Chiarella*, the Court held that a duty of affirmative disclosure arise only in instances where there exists a fiduciary relationship, or similar relationship of trust and confidence, between parties. *Id.* at 228,

100 S.Ct. at 1114. In this case, Equitable clearly did not occupy a fiduciary role with respect to plaintiffs, as a lender or otherwise. *See Noonan v. Granville Smith,* 537 F.Supp. 23, 27 (S.D.N.Y.1981). The question remains, however, whether Equitable occupied a similar relationship of trust and confidence with respect to plaintiffs.[20]

The Court finds that the pleadings fail to support the conclusion that Equitable occupied such a relationship of trust and confidence. With the exception of James Stritzinger, Equitable rejected plaintiffs' applications for letters of credit in connection with their purchases of Eagle shares. Moreover, all of plaintiffs' applications for letters of credit, both with respect to Wilmington House and Eagle, were principally handled through Der. Prior to the November 6, 1978 meeting, plaintiffs had little, if any, direct contact with the bank. These circumstances belie the conclusion that Equitable occupied a position of high trust and confidence with respect to plaintiffs. In fact, at least by early 1981, plaintiffs suspected improprieties in the handling of their letters of credit. Plaintiffs allege that at the November 6, 1978 meeting, Rous made very general representations about the Eagle partnership, which arguably constituted implicit representations about the Wilmington House partnership as well. Nevertheless, even if Rous' actions could be viewed as advising plaintiffs about their investments, this isolated incident hardly gave rise to the type of relationship of high trust and confidence that is contemplated by the *Chiarella* holding. Consequently, the Court finds, as a matter of law, that Equitable did not owe an affirmative duty of disclosure to plaintiffs, apart from the duties of disclosure that arose from and related to the alleged misrepresentations made by Rous at the November 6, 1978 meeting.

With respect to Rous' alleged misrepresentations, Equitable contends that only Thomas Ruger and Virgil Scott may state a claim on the basis of the misrepresentations. Equitable argues that Ruger and Scott were the only plaintiffs present at the November 6, 1978 meeting and that, therefore, Rous could not have intended to defraud the other plaintiffs through the misrepresentations.

■ Equitable's argument is without merit. The fact that only Ruger and Scott were present at the November 6, 1978 meeting does not preclude the possibility that Rous intended for Ruger and Scott to communicate the misrepresentations to the other plaintiffs. Rous was potentially aware of the Wilmington House plaintiffs through their letters of credit. Rous was also potentially aware of those Eagle plaintiffs who had entered into their subscription agreements prior to the meeting. These Wilmington House and Eagle plaintiffs include Descomp, Inc., and Data Controls North, Inc., corporations managed and controlled by Ruger and Scott; Ruger's wife, Patricia Ruger; and Scott's wife, Marie Scott. Furthermore, plaintiffs allege that Rous was informed at the meeting that James Stritzinger, a friend of Ruger and Scott, was seriously interested in purchasing Eagle shares. Thus, it is quite possible that Rous intended for Ruger and Scott to communicate his misrepresentations to the other plaintiffs, in order to promote and protect Equitable's interests in the Eagle partnership, as well as the Wilmington House partnership.

■ Also, it is not necessary that Rous have intended for Ruger and Scott to communicate his misrepresentations to other plaintiffs in order for liability to arise under 10b–5 with respect to the other plaintiffs. Rule 10b–5 imposes liability for reckless misrepresentations, as well as intentional misrepresentations. *See Sharp v.*

---

20. Plaintiffs have set forth other grounds out of which an affirmative duty of disclosure allegedly arose in this case. *See, e.g., Zweig v. Hearst Corp.,* 594 F.2d 1261 (9th Cir.1979) (conflicts of interest); *Chasins v. Smith, Barney & Co.,* 438 F.2d 1167, 1170–72 (2d Cir.1970) (market mak-

ing); *White v. Abrams,* 495 F.2d 724, 735–36 (9th Cir.1974) (flexible duty). However, to the extent that the theories of disclosure set forth in these cases are inconsistent with the Supreme Court's holding in *Chiarella,* the Court rejects these theories.

*Coopers & Lybrand*, 649 F.2d 175, 193 (3d Cir.1981), *cert. denied*, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982). If Rous had special reasons to expect that Ruger and Scott might communicate the misrepresentations to other plaintiffs, then liability would arise with respect to the other plaintiffs. *See Restatement (Second) of Torts*, § 531, 533 (1977). Certainly, it is possible that Rous had special reasons to expect that Ruger and Scott might communicate his misrepresentations to other plaintiffs.

Finally, Equitable contends that plaintiffs' allegations regarding Rous' implicit misrepresentations about the soundness of the Wilmington House partnership are "simply absurd." Equitable's position is certainly not without merit. It would seem that if Rous had intended to mislead plaintiffs about their Wilmington House investments, he would have done so through direct misrepresentations. Nevertheless, the Court cannot say as a matter of law that, if Rous intended to mislead plaintiffs about the soundness of the Wilmington House partnership, it is inconceivable that he would have done so through implicit misrepresentations. More importantly, as discussed above, recklessness is the standard of liability under 10b–5. The Court cannot say as a matter of law that, if Rous made misrepresentations about the soundness of the Eagle partnership, these misrepresentations did not recklessly mislead plaintiffs about the soundness of the Wilmington House partnership, given that Der was the central principal behind both partnerships.

Assuming, then, the truth of plaintiffs' allegations and drawing all reasonable inferences from the allegations in a light most favorable to plaintiffs' claims, plaintiffs state a claim under 10b–5 with respect to Rous' alleged misrepresentations at the November 6, 1978 meeting.[21] Plaintiffs not only state a claim with respect to the affirmative misrepresentations themselves, but also state a claim with respect to Rous' failure to disclose material information which rendered the representations false or misleading, and Equitable's intentional or reckless failure to subsequently disclose newly acquired information which rendered the representations false or misleading at the time of representation.[22] *See, e.g., Greenfield v. Heublein, Inc.*, 575 F.Supp. 1325, 1336 (E.D.Pa.1983); *Rose v. Arkansas Valley Environmental & Utility Authority*, 562 F.Supp. 1180, 1207–08 (W.D.Mo.1983).

### 2. *Aiding and Abetting, and Conspiracy Liability*

Plaintiffs allege that Equitable is liable under Rule 10b–5 and § 12(2) of the Securities Act as an aider and abetter of, and co-conspirator with, Der and other Wilmington House and Eagle principals in connection with schemes to defraud plaintiffs into purchasing shares of the partnerships. Plaintiffs allege that, in furtherance of the Wilmington House scheme, Equitable issued letters of credit to finance plaintiffs' purchase of shares in return for kickbacks. Plaintiffs allege that the essence of the Eagle scheme was an undisclosed plan to

**21.** Lurking within this case is the issue of whether Equitable may be liable for the federal securities law violations of its employees. The Third Circuit has held that the doctrine of "respondeat superior" is generally inapplicable to federal securities law claims. *See Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880, 884 (3d Cir. 1975). *But see Sharp v. Coopers & Lybrand*, 649 F.2d at 181–84 (limited exception for brokerage and accounting firms based upon their positions of high trust in the marketplace). Consequently, if the fraudulent acts of Equitable's employees may not be directly attributable to Equitable as official acts of the bank, *see Sharp v. Coopers & Lybrand*, 649 F.2d at 182 n. 8, then Equitable may be liable for the employees' federal securities law violations only as a controlling person of the employees under § 20(a) of the Exchange Act or § 15 of the Securities Act. However, in order to establish liability on the part of Equitable as a controlling person of its employees, plaintiffs would have to establish that Equitable "culpably participated" in the employees' securities law violations. *See Rochez Brothers, Inc. v. Rhoades*, 527 F.2d at 890.

**22.** Apart from the implied misrepresentation regarding the Wilmington House partnerships, Equitable has not challenged the materiality of the specific misrepresentations and omissions alleged by plaintiffs. Consequently, the Court expresses no judgment on this matter at this time.

bail out the financially troubled partnership, and bail out Equitable's loans to the partnership, through the resyndication of the partnership and the sale of shares to plaintiffs. Plaintiffs allege that, in furtherance of this scheme, Equitable made misrepresentations to plaintiffs at the November 6, 1978 meeting.

In order to establish aiding and abetting liability under the federal securities laws, a plaintiff must prove: (a) an underlying securities violation; (b) knowledge by the aider and abetter of the wrongful act which constitutes the violation; and (c) knowing and substantial assistance in the wrongful act by the aider and abetter. *See Monsen v. Consolidated Dressed Beef Company, Inc.*, 579 F.2d 793, 799 (3d Cir.), *cert. denied sub nom., First Pennsylvania Bank, N.A. v. Monsen*, 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978). Mere inaction on the part of the aider and abetter may be sufficient to establish liability if the aider and abetter consciously intended to assist in the perpetration of the wrongful act. *See Id.* at 800.

In order to establish conspiracy liability under the federal securities laws, a plaintiff need only establish: (a) a wrongful act which constitutes a securities violation; and (b) an agreement between the conspirator and the wrongdoer to commit the wrongful act. *See Troyer v. Karcagi*, 476 F.Supp. 1142, 1153 (S.D.N.Y.1979). The agreement to commit a wrongful act is the central element of a conspiracy. In establishing conspiracy liability, an agreement may be inferred from the facts in a case. *See Ferguson v. Omnimedia, Inc.*, 469 F.2d 194, 198 (1st Cir.1972).

Plaintiffs' allegations are sufficient to state claims of aiding and abetting and conspiracy against Equitable. The Wilmington House letters of credit, together with the alleged kickbacks, provide a sufficient basis for an inference that Equitable knowingly provided substantial assistance to Der and others in a scheme to defraud plaintiffs in connection with their Wilmington House shares. *See, e.g., Vogel v. Trahan* [1979–1980 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,303, at 97,082 (E.D.Pa.1980); *Tucker v. Janota* [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,701, at 94, 715–16 (N.D.Ill.1978). Moreover, the alleged kickbacks provide a sufficient basis for an inference that Equitable entered into a conspiratorial agreement to defraud plaintiffs in connection with their Wilmington House shares. Equitable's alleged misrepresentations at the November 6, 1978 meeting provide a sufficient basis for an inference that Equitable knowingly provided substantial assistance to Der and others in a scheme to defraud plaintiffs in connection with their Eagle shares. *See E.D. Warde & Sons v. Colorado National Bank*, 502 F.Supp. 461, 464 (D.Colo.1980). Furthermore, the circumstances surrounding the resyndication of the Eagle partnership provide a sufficient basis for an inference that Equitable entered into a conspiratorial agreement to defraud plaintiffs in connection with their Eagle shares.[23]

### 3. *Controlling Persons Liability*

Plaintiffs claim that Equitable is liable under § 20 of the Exchange Act and § 15 of the Securities Act, based upon Equita-

---

**23.** Equitable contends that plaintiffs may not state an aiding and abetting or conspiracy claim under § 12(2) of the Securities Act because § 12(2), on its face, only provides for a cause of action by a purchaser of securities against his immediate seller. The Third Circuit has held that, in general, a purchaser of securities may not state a cause of action under § 12(2) against persons other than his immediate seller. *Collins v. Signetics Corp.*, 605 F.2d 110, 112–13 (3d Cir.1979). However, the Court has expressly declined to rule upon the question of whether an aiding and abetting claim provides an exception to § 12(2)'s privity requirement. *Id.* at 113–14. The issue is a difficult one because the liability of a seller's aider and abetter or conspirator derives from the securities violations of the seller. Many courts have held that aiding and abetting and conspiracy claims provide an exception to § 12(2)'s privity requirement. *See, e.g., Frankel v. Wyllie & Thornhill, Inc.*, 537 F.Supp. 730, 744 (W.D.Va.1982); *deBruin v. Andromeda Broadcasting Systems, Inc.*, 465 F.Supp. 1276, 1280 (D.Nev.1979); *Stern v. American Bankshares Corp.*, 429 F.Supp. 818, 824 (E.D.Wis.1977); *Lorber v. Beebe*, 407 F.Supp. 279, 287–88 (S.D.N.Y.1975). The Court has determined to follow this well established exception to § 12(2)'s privity requirement.

ble's role as a controlling person of Der and other Eagle principals in connection with the alleged fraudulent bail out scheme. Plaintiffs contend that Equitable helped engineer the scheme in order to recoup its outstanding loans to the Eagle partnership. Moreover, plaintiffs contend that Equitable possessed the financial leverage to dictate the bail out, given that the partnership was in substantial risk of defaulting on its loans at the time of the resyndication. In sum, plaintiffs argue that Equitable possessed the power, and exercised the power, to engineer a plan to defraud plaintiffs in connection with an undisclosed bail out scheme.

▆ In order to state a claim under § 20 of the Exchange Act or § 15 of the Securities Act, a plaintiff need only establish that the controlling person possessed indirect, de facto control over the wrongful acts of the controlled person. *See Gould v. American-Hawaiian Steamship Co.,* 535 F.2d 761, 779 (3d Cir.1976). Furthermore, the liability of a controlling person does not turn upon whether he dictated the wrongful acts of the controlled person. Mere inaction on the part of the controlling person is sufficient, if he intended to thereby assist in the wrongdoing. *See Rochez Brothers, Inc. v. Rhoades,* 527 F.2d 880, 890 (3d Cir.1975). In any event, however, liability under § 20 of the Exchange Act or § 15 of the Securities Act requires "culpable participation" on the part of the controlling person. *See, e.g., Gould v. American-Hawaiian Steamship Co.,* 535 F.2d at 779; *Rochez Brothers, Inc. v. Rhoades,* 527 F.2d at 890.

▆ The Court has some doubt as to the merits of plaintiffs' claims. Even assuming that a fraudulent bail out scheme was perpetrated in this case, the question remains as to who had the power to control whom. If, as plaintiffs allege, Equitable's loans to the partnership were in substantial risk of default and Equitable faced the prospects of heavy financial losses upon default, it would seem that Der and other principals possessed as much leverage over Equitable as Equitable possessed over the principals. Nevertheless, the circumstances surrounding the resyndication of the Eagle partnership, as alleged by plaintiffs, certainly could give rise to a set of facts that would support plaintiffs' bail out theory. Further resolution of this matter must await a fuller development of the facts.

## PARTICULARITY OF PLEADINGS

Equitable alleges that many of plaintiffs' claims must be dismissed for failure to state a cause of action with the degree of particularity required by Fed.R.Civ.P. 9(b). The Court, however, is sufficiently satisfied that the claims that remain in this case are potentially meritorious ones and that Equitable has been given sufficient notice of the claims asserted against it.

An Order will be entered in accordance with this Opinion.